### CITY OF FINDLAY v. PERTZ et al.

#### (Circuit Court of Appeals, Sixth Circuit. February 25, 1895.)

#### No. 195.

1. PRINCIPAL AND AGENT—AGENT ACTING FOR BOTH PARTIES TO CONTRACT.

     One B., who was an agent of P. & S. for the sale of automatic separators, manufactured by them for use on natural gas wells, entered the employ of the board of gas trustees of the city of F. as superintendent of the natural gas works managed by them for said city. While in the employ of said board, he ordered, in its name, from P. & S., 32 separators, upon the sale of each of which P. & S. allowed him a commission of $10, the agreement for such commission being unknown to the board of gas trustees. As soon as the board learned of such agreement, they discharged B., notified P. & S. that they disavowed the contract made by B. on the ground of fraud in making the same, offered to return the separators, and demanded back the money which had been paid under the contract. *Held*, that the conduct of B. in acting as agent for both parties, without the knowledge of the board of trustees, and of P. & S., in procuring the contract through such agency, was fraudulent, and entitled the city to rescind the contract.

2. SAME—RATIFICATION—MUNICIPAL CORPORATION.

     *Held*, further, that the contract, being neither immoral nor unlawful, but such as the city had a right to make, might be ratified by the city, as by a private individual, either formally or by its conduct.

In Error to the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

This was an action by John W. Pertz and George R. Stewart against the city of Findlay, Ohio, to recover the price of certain automatic gas separators alleged to have been sold to said city. In the circuit court the plaintiffs recovered judgment. Defendant brings error.

The facts necessary to be stated to an understanding of the legal questions to be decided are substantially these:

The plaintiff in error is a municipal corporation of the state of Ohio. It owned and operated a plant for the distribution of natural gas to consumers within the city. This plant was under the control of an arm of the city government called the "board of gas trustees," composed of five members, elected annually by the qualified voters of the city. That board had authority to employ a superintendent, whose duty it was to maintain and operate the plant, make all necessary improvements and repairs, collect the dues 'from consumers, and render all other necessary services, under direction and supervision of the board of gas trustees, as might be required for a successful operation of a natural gas system. The duties of the superintendent were such as to require an expert in the boring and management of gas wells and in the safe and economical distribution of the gas to consumers. The position was that of an employé of the city government, and was one involving expert knowledge and a considerable degree of trust and confidence. The defendants in error were partners, doing business under the firm name of Pertz & Stewart, at Kokomo, Ind., and as such were patentees and manufacturers of a machine called an "automatic separator." These machines were adapted to be attached to the orifice of a natural gas well, and purported to separate the oil or water which came to the surface intermingled with the gas, and were represented to operate automatically. This firm had in their service one Melvin M. Brooks, who acted as their agent in Indiana for the sale of their separators upon a commission. In the spring of 1890, this agent went into the Findlay, Ohio, oil field, for the purpose of selling separators for the said Pertz & Stewart. While in that field as the agent of defendants in error, he was chosen superintendent of the gas plant owned and operated as aforesaid by the city of Findlay. July 12, 1890, Brooks wrote to defendants in error a letter concerning separators for use on the city wells. That letter is not produced by them. Mr. Stewart states that the letter was one of inquiry as to how the separators would work on oil wells. The answer to that letter was dated July 16, 1890, and was in these words:

"Pertz & Stewart, Manufacturers of Automatic Gas Separator and Drip.

"Kokomo, Ind., July 16, 1890.

"Mr. M. M. Brooks, Findlay, Ohio—Dear Sir: Your favor of the 12th received. We will be glad to furnish you any number of separators you may desire. You may connect them to a well producing oil with the gas, and rest assured that they will separate the oil just as readily as the water; but, when you desire to connect to a well producing oil, please so state in your order, for the reason that we make the valve a little larger for oil than we do for water. We sell them with the same guaranty for separating oil as we do for water. Hoping to hear from you soon,

"Yours very truly, Pertz & Stewart."

The board of gas trustees, upon representations of Brooks, authorized him to purchase for the city of Findlay three of these automatic separators. This was done by a letter dated July 22, 1890, in these words:

"Findlay, Ohio, July 22nd, 1890.

"Pertz & Stewart, Kokomo, Ind.—Gentlemen: Please ship us at once to Stewartsville, Hancock County, Ohio, 3 separators for oil and gas, and 1 for water and gas. Stewartsville is on the Nickel Plate Railroad.

"Yours truly, The City Gas Works."

This letter was written by Brooks, and defendants in error admit that, when received, they recognized it to have been written by him.

August 11, 1890, Brooks ordered 16 other separators, by letter in these words:

"Findlay, Ohio, August 11th, 1890.

"Messrs. Pertz & Stewart, Kokomo, Ind.—Gentlemen: Please ship to Stewartsville, Ohio, via Nickel Plate R. R., 10 automatic separators, and to Van Buren 6 of the same. The latter is a station on the Toledo, Columbus & Cincinnati R. R., a short distance north of Stewartsville. If you cannot ship the entire order at once, please ship to Stewartsville first. I think that oil is the * * * likely to come first in these wells. I examined the ones sent, but can't detect any difference in them.

"Truly yours,                        The City Gas Works,
                                     "By M. M. Brooks, Supt."

On September 7, 1890, Brooks again made an order for 13 additional machines, by the following letter:

"Findlay, Ohio.

"Pertz & Stewart, Kokomo, Ind.—Gentlemen: Please ship separators as follows: 5 to Stewartsville; 8 to Findlay. I had discovered the error in your invoice of Aug. 22d, and had it corrected. Please send them forward as soon as possible.

"Truly yours,                        M. M. Brooks, Supt."

The first three separators were billed at $105 each, and on September 12, 1890, a remittance in full of bill was made by the following letter:

"Findlay, Ohio, September 12, 1890.

"Pertz and Stewart, Kokomo, Ind.—Gentlemen: Inclosed find New York Exchange No. 37,568, for three hundred and fifteen dollars, same being on account. Please acknowledge receipt of same.

"Respectfully yours,                 The City Gas Works,
                                     "Per C. K. Beach, Sec'y."

As these separators were delivered, they were attached to the gas wells operated by the gas trustees, by their superintendent, Melvin M. Brooks. November 1, 1890, defendants in error rendered an account for the 29 separators which had been ordered by the letters of August 11th, and September 7th. This account was in these words and figures:

"Kokomo, Ind., November 1, 1890.

"City Gas Works, Findlay, Ohio, In Account with Pertz & Stewart, Proprietors of John W. Pertz Automatic Separator.

| | | | |
|---|---|---|---:|
| Aug. | 20. | To Mdse | $315 00 |
| " | 22. | " | 630 00 |
| " | 23. | " | 105 00 |
| Sept. | 4. | " | 630 00 |
| " | 16. | " | 840 00 |
| " | 22. | " | 525 00 |
| | | | $3,045 00 |

"Please remit. Unless otherwise advised, will draw for $1,050 on the 10th inst. Please honor draft, and oblige."

To this the following reply was made:

"Findlay, Ohio, November 6, 1890.

"Messrs. Pertz & Stewart, Kokomo, Ind.—Gentlemen: Please do not draw on us. We note you have billed the separators at the gross price. Please send credit memoranda of the discount by return mail. We understand the discount is ten per cent. on a sale of four. We presume a greater discount will be allowed on the number we have purchased. Your reply by return mail will oblige,

"Yours respectfully,                 The City Gas Works,
                                     "Chas. K. Beach, Secy."

The gas trustees denied that they had authorized the purchase of the 29 separators ordered by the letters of Brooks above cited, and, suspecting that

the price charged was excessive, began to make inquiry. Brooks, when approached on the subject, said $105 was the net price, and that no commission or discount was allowed; upon being pressed about the matter, and confronted with evidence that a discount or commission had been allowed other purchasers, admitted that he was the agent of Pertz & Stewart, and that they had allowed him a commission of $10 on each of the separators purchased for the city of Findlay. He admitted that he had received $30 as commission on the three separators bought by direction of the trustees, and offered to turn it over to the city. He admitted that he would receive $290 on the other purchases, and proposed that these commissions should be credited on the account against the city. Upon these admissions he was immediately discharged from his position.

November 17, 1890, the defendants in error wrote the following letter, and inclosed a new account, crediting thereon the commissions due to Brooks:

"Kokomo, Ind., November 17, 1890.

"City Gas Works, Findlay, Ohio, in Account with Pertz & Stewart, Proprietors of John W. Pertz Automatic Separator and Drip.
1890.

| | | | | | | |
|---|---|---|---|---|---|---|
| July 26. | 3 separators, at $105 | | | ...........................| $315 00 | |
| Aug. 20. | 3 | " | " | " ........................| 315 00 | |
| " 22. | 6 | " | " | " ........................| 630 00 | |
| " 23. | 1 | " | " | " ........................| 105 00 | |
| Sept. 4. | 6 | " | " | " ........................| 630 00 | |
| " 16. | 8 | " | " | " ........................| 840 00 | |
| " 22. | 5 | " | " | " ........................| 525 00 | $3,360 00 |

| | | | |
|---|---|---|---|
| Sept. 12. | By N. Y. Exchange .......................| $315 00 | |
| Nov. 13. | By M. M. Brooks.........................| 30 00 | |
| Nov. 13. | By Com. on 29th Sept., each $10.00 ........| 290 00 | 635 00 |

Balance ................................................ $2,725 00

"Pertz & Stewart,
"Manufacturers of Automatic Gas Separator and Drip."

"Kokomo, Ind., November 17, 1890.

"City Gas Works, Findlay, Ohio—Gentlemen: Inclosed please find statement of your account to November 17, 1890. We received letter from Mr. Brooks the 15th, under date of November 13th, inclosing $30.00 commission, paid him on three separators that you had paid for September 12. Mr. Brooks requests us to place the same to the credit of the City Gas Works, and also the $10.00 commission on each of the twenty-nine separators not yet paid for, which request has been complied with, as you will notice in statement. There seems to have been some misunderstanding between Mr. Brooks and the company or gas works concerning the $10.00 commission on separators. Hoping the matter is satisfactorily adjusted, we are

"Yours very truly, Pertz & Stewart,
"By Stewart."

To this the gas trustees replied, under date of November 18, 1890, as follows:

"Office of the City Gas Works. Superintendent.

"Findlay, Ohio, November 18, 1890.

"Messrs. Pertz & Stewart, Kokomo, Ind.—Gentlemen: Yours of November 17 received, saying you have a letter from Mr. Brooks on the 15th inst., dated 13th inst., returning to you $30.00 commission, paid by you to him on three separators that we had paid for September 12, and that, at Mr. Brooks' request, you place the $30.00 to the credit of the City Gas Works, and that you also credit us with the $10.00 commission on each of the twenty-nine separators not yet paid for, all at the request of Mr. Brooks. Your dealings with Mr. Brooks were wholly unauthorized by us, and without our knowledge, and we have determined that we have no contract whatever with you, and will in no way recognize any indebtedness to you. Whatever contract you made with Mr. Brooks you can look to him alone for settlement. We cannot now permit you by your letter of the 17th inst. to make any contract with

us, and desire you to distinctly understand you never had any contract with this board, and we have no present intention of any with you. You no doubt realize the fraudulent character of your dealings with Mr. Brooks so far as this board is concerned, as we judge from your letter. The separators you sent to Mr. Brooks are subject to your order here, so far as we are concerned in the matter, but you must at once take care of them at your own expense. We will see to the disconnecting of such as are attached to wells, but will have no further care of them. The account you inclose us will not be paid, as we owe you nothing whatever. We demand that you return to us the $315.00 sent you on September 12, as the same was sent you under a mistake. As to the fact of our being indebted to you, if it is not returned, we shall take legal steps to collect it by attachment on the separators you have here. You understand we base our action and claim on the ground of fraudulent contract between you and Mr. Brooks.

"Yours, etc.,                            Board of Gas Trustees,
                                       "J. G. Hull, President."

January 19, 1891, suit was begun by defendants in error in the circuit court of the United States for the Northern district of Ohio for the sum of $2,725, with interest, being the balance due as per account rendered November 17, 1890, and above set out. The pleading was, under the Ohio Code practice, a petition, answer, and reply. The answer of the city of Findlay set up the following defenses: (1) That the superintendent of the City Gas Works, Melvin M. Brooks, was secretly the agent of the plaintiffs, Pertz & Stewart, and that they had illegally and fraudulently procured him to procure for them a contract for the sale of their separators by promising to him a commission on each separator sold. (2) That the defendant was absolutely ignorant of the dual agency of the said Brooks, and in reliance upon him as its sole and exclusive servant and employé, and in reliance upon his representations as to the usefulness and value of the separators sold by plaintiffs and as to the necessity for purchasing same, had authorized him to contract for three of said machines. (3) That said Brooks, without authority, had ordered 29 other separators, and had placed them upon various gas wells belonging to defendant, without the knowledge of defendant. (4) That defendant had not discovered the fact that said Brooks was at the same time acting for both buyer and seller until in November, 1890, and that upon that discovery it had discharged him from its service, and repudiated the entire transaction, and notified plaintiffs that the said separators were subject to their order, and demanded a return of the $315 paid them for the three separators ordered with its consent. (5) It alleged, in addition, that the said Brooks represented that said separators would effectually separate either oil or water from gas, and would automatically eject the water or oil thus separated, and were reasonably worth $105 each, but that said machines were not capable of doing such work as represented, or doing it automatically, and were of no practical value. (6) This answer concluded with a prayer that the petition might be dismissed, and that defendant have judgment for $315, and for other proper relief. The reply to this answer admitted that Brooks had acted as their agent in Indiana, and that in 1890 he went to the Findlay oil fields for the purpose of selling separators; that the first they heard from him was when they received from him the orders heretofore set out. They admitted that they had sent him a commission on the separators first ordered. They say that they did not know that the gas trustees of Findlay were ignorant of the relations between Brooks and the plaintiffs, and supposed the commissions allowed Brooks "would eventually be credited to the city." They insist that they acted in good faith, and without collusion or purpose to defraud defendants; that the invariable price of the separators was $105, with an allowance of $10 on each sold through their agents; that, at the request of Brooks, they had finally credited the city with the commissions he had earned. They further insisted that the said separators were attached to the gas wells at the time the defendants repudiated the contract, and that defendants had continued to use them; and were using them when suit was begun; that the use which had been made of them had made them unmarketable by wear and exposure, and that they could not be disposed of except at a considerable sacrifice. There was a jury, and verdict for the full amount claimed by de-

fendants in error. From the judgment thereon, a writ of error was sued out by the city of Findlay, and errors have been assigned upon the charge and for refusal to charge as requested.

Janson Blackford, for plaintiff in error.

Harvey Scribner and Blacklidge, Shirley & Moon, for defendants in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts, delivered the opinion of the court.

1. The objection that the bill of exceptions was not filed during the term is not well taken. During the term at which the judgment was rendered, and on the 19th of September, 1893, leave was granted to file a bill of exceptions within 40 days. By an order made December 13, 1893, it was recited that a bill of exceptions had been allowed and signed and filed on the 24th of October, 1893. This was within the time allowed by the order made during the trial term, and was entirely within the power of the court to permit.

2. The objection that the bill of exceptions does not show that exceptions to the charge of the court were taken before retirement of the jury is equally groundless. The charge is made a part of the bill of exceptions, and follows the evidence, being preceded only by a request made for a peremptory charge for plaintiff, and by two requests for special charges by defendant. Immediately following the charge there follows: "Mr. Blackford [one of the attorneys representing the plaintiff in error]: The defendant excepts," etc. Then follows the ground of exception, including the refusal to charge as requested, and exceptions to the charge as delivered. We think it sufficiently appears that exceptions to the charge were seasonably taken. The learned trial judge took from the jury all consideration of the defenses presented by the plaintiff in error, and instructed them that the only issue for their determination was to determine the reasonable market value of these separators when delivered. As the proof was uniform that the patentees and makers had but one price, and that they were to be obtained only from them and at their price, the instruction was equivalent to a peremptory instruction for the full amount of the account sued on. This view of the court seems to have been in a large part due to the evidence tending to show a continued use of these machines after the discovery of the alleged dual relation occupied by its superintendent, Melvin M. Brooks. He seems also to have attached great weight to the fact that the defendants in error had not especially induced or procured Brooks to influence this particular sale. The latter consideration seems to us not at all important. There was evidence tending quite strongly to establish the fact that defendants in error regarded Brooks as having acted for them in procuring the order forwarded by him for these separators.

In support of the defense there was evidence: First. That Brooks had acted as their (Pertz & Stewart's) agent on commission for a long time before going to the Findlay gas district, and that he had

gone into the Findlay district for the purpose of continuing the sale of these separators. Second. The separators delivered to the city were all billed at $105 each, and no discount or credit was proposed, allowed, or mentioned as due to the city by virtue of the relation its superintendent bore to them. Third. They remitted to Brooks personally a commission on the first order, and gave the city no notice of this fact, and held themselves liable to Brooks for commissions on his subsequent orders, so soon as their account was paid. Fourth. When the city discovered the commission allowed its superintendent, and when that superintendent directed the defendants in error to allow the city a credit for these commissions, then and only then did they propose such a credit.

Another undisputed fact is that Brooks concealed his relation to the sellers, and concealed his receipt of a commission, and, when confronted with the charge, utterly denied that he had been allowed any commission or discount on the sale, or that the separators could be bought with a discount off the market price. The answer suggested by defendants in error to all this was that the sellers did not know that the buyer was ignorant that its agent was likewise the agent of the sellers, and supposed that eventually this double agent would give the buyer for whom he bought the benefit of the commission paid him by the sellers for whom he sold. This defense is absolutely frivolous. Undoubtedly there are circumstances under which the same person may act as the agent of two distinct principals, and in regard to transactions and dealings between the principals. As said by Campbell, J., in Mining Co. v. Seuter, 26 Mich. 76: "The authority of agents may, where no law is violated, be as large as their employers may choose to make it," etc. "There can be no presumption that the agent of the two parties will deal unfairly with either. And when they both deliberately put him in charge of their separate concerns, and there is any likelihood that he may have to deal with the rights of both in the same transactions, instead of lessening his powers, it may become necessary to enlarge them far enough to dispense with such formalities as one man would use with another, but which could not be possible for a single person to go through with alone." It is most obvious that in all such cases of a double agency it is absolutely essential that both principals shall know of and assent to the dual character. Capener v. Hogan, 40 Ohio St. 203; United States Rolling-Stock Co. v. Atlantic & G. W. R. Co., 34 Ohio St. 450; Bell v. McConnell, 37 Ohio St. 400; Mechem, Ag. § 67.

The evidence we have recited, to say the least of it, strongly tended to establish the fact that Brooks understood himself to have an arrangement with the defendants in error by which he would be allowed personally a commission on each separator which he, as an employé of the plaintiff in error, should buy from the defendants in error, and it tends with equal force to establish the fact that the defendants in error recognized that Brooks was personally entitled, under an existing arrangement with them, to demand and receive the same commission he would have earned by a like sale to any other customer. There was therefore evidence entitling the plaintiff

in error to go to the jury upon the defense of fraud invalidating the contract of sale.

Any agreement or understanding between one principal and the agent of another, by which such agent is to receive a commission or reward if he will use his influence with his principal to induce a contract, or enter into a contract for his principal, is pernicious and corrupt, and cannot be enforced at law. This principle is founded upon the plainest principles of reason and morality, and has been sanctioned by the courts in innumerable cases. "It has its foundation in the very constitution of our nature," says Judge Dillon, "for it has authoritatively been declared that a man cannot serve two masters, and is recognized and enforced wherever a well-regulated system of jurisprudence prevails." 1 Dill. Mun. Corp. § 444. "An agent cannot be allowed to put himself in a position in which his interest and his duty will be in conflict." Leake, Cont. (3d Ed.) 409. The tendency of such agreement is to corrupt the fidelity of the agent, and is a fraud upon his principal, and is not enforceable, "even though it does not induce the agent to act corruptly." "It would be most mischievous to hold that a man could come into a court of law to enforce such a bargain on the ground that he was not in fact corrupted. It is quite immaterial that the employer was not damaged." Wald's Pol. Cont. 245, 246, note; citing Harrington v. Dock Co., 3 Q. B. Div. 549, and other cases. Taussig v. Hart, 58 N. Y. 425; United States Rolling-Stock Co. v. Atlantic & G. W. R. Co., 34 Ohio St. 450–460; Smith v. Sorby, 3 Q. B. Div. 552; Young v. Hughes, 32 N. J. Eq. 372; Yeoman v. Lasley, 40 Ohio St. 190. Such agreements are a fraud upon the principal, "which entitle him to avoid a contract made through such agency." Leake, Cont. 409; Panama & S. P. Tel. Co. v. India Rubber G. P. & Tel. Works Co., 10 Ch. App. 526. "Where there are a principal, an agent, and a third party contracting with the principal, and cognizant of the agent's employment, and there are dealings between the third party and the agent which gives the agent an interest against his duty, then the principal, on discovering this, has the option of rescinding the contract altogether." Wald's Pol. Cont. 247. "Any profit made by an agent in the execution of his agency must be accounted for to the principal, who may claim it as a debt for money received to his use. A gratuity given to an agent for the purpose of influencing the execution of his agency vitiates a contract subsequently made by him, as being presumptively made under that influence; and a gratuity to an agent after the execution of the agency must be accounted for to his principal; as in the case of a servant employed to make payments accepting discounts or presents from the creditor." Leake, Cont. 409. The same author says: "If an agent stipulates with a contractor for a commission upon the work to be done for his principal, he must account for the commission, and it is good ground for his dismissal." Page 410; Ice Co. v. Ansell, 39 Ch. Div. 339; Stoner v. Weiser, 24 Iowa, 434; Bell v. Bell, 3 W. Va. 183; Moore v. Mandlebaum, 8 Mich. 433. The principle which prevents an agent from contracting with himself, or from entering into any agreement which

gives him an interest conflicting with his duty, applies more strongly to the officers, servants, and agents of a municipal government than to private parties. 1 Dill. Mun. Corp. § 444.

Brooks, as we have already stated, was an employé of the city of Findlay. This Pertz & Stewart knew. The letter heads and his official signature fully advised them that he was the agent of a public corporation. Now, if with this knowledge they dealt with the city of Findlay knowing the relation which he bore to them, they knew that his interest in making a sale for them conflicted with his duty and fidelity as a public agent. The agency of Brooks for the city was one which required expert knowledge, and involved a considerable degree of trust and confidence. His duty was to give to the public service the full benefit of a disinterested judgment and the utmost fidelity. Any agreement or understanding by which his judgment or duty conflicted with his private interest was corrupting in its tendency. We know of no more pernicious influence than that brought about through a system of commissions paid to public agents engaged in buying public supplies. Such arrangements are a fruitful source of public extravagance and peculation. The conflict created between duty and interest is utterly vicious, unspeakably pernicious, and an unmixed evil. Justice, morality, and public policy unite in condemning such contracts, and no court will tolerate any suit for their enforcement.

The forcible language of Mr. Justice Field, in speaking for the court in Tool Co. v. Norris, 2 Wall. 45, and repeated in Oscanyan v. Arms Co., 103 U. S. 274, is quite as applicable to the debauchery of the agent of a municipal corporation as it was when the interests of the federal government were sought to be affected by the same kind of pernicious influence. In the case cited the learned justice said, concerning such contracts:

"Considerations as to the most efficient and economical mode of meeting the public want should alone control in this respect the action of every department of government. No other consideration can lawfully enter into the transaction so far as the government is concerned. Such is the rule of public policy, and whatever tends to introduce any other element into the transaction is against public policy. That agreements like the one under consideration have this tendency is manifest. They tend to introduce personal solicitation and personal influence as elements in the procurement of contracts, and thus directly lead to inefficiency in the public services and to unnecessary expenditures of the public funds. * * * All agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or ordinary course of legislation, are void as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation by refusing them recognition in any of the courts of the country." Oscanyan v. Arms Co., 103 U. S. 274.

This principle of public policy finds full recognition in section 6969 of the Revised Statutes of Ohio, by which it is provided that any public officer, agent. servant, or employé who, while acting as such public officer, agent, or employé, shall become directly or indirectly interested in any contract for the purchase of any property for the state, county, or municipality, shall be guilty on conviction of a penitentiary offense. This statute has been construed as ap-

plying to the agents, officers, and employés of towns, villages, and cities of the state, and as a prohibition upon all contracts between such a municipality and an agent or servant interested therein. Doll v. State, 45 Ohio St. 445, 15 N. E. 293.

The contract or arrangement between defendants in error and Brooks, the servant of the plaintiff in error, was no more illegal after this statute than it was under common-law principles before the statute. What was the effect of that arrangement or contract on the contract with plaintiff in error? We must distinguish between the bargain for a commission between the defendants in error and the agent of the city, and the contract between the two principals. The first was clearly illegal and incapable of enforcement; the latter was on its face altogether within the contracting power of the parties, was free from any immorality, and altogether legitimate. The means by which the city may have been induced to enter into it was the vicious element in the trade. The board of gas trustees had no intention to deal with Brooks or any one else incapacitated under the Ohio statute, or under principles of public policy, from contracting with the city. That board was wholly ignorant of the secret arrangement between its agent and the persons with whom it proposed to bargain. Neither that board nor the city council knew of the double agency of Brooks. Undoubtedly, upon the authorities we have already cited, the city, upon discovery of the dealings between its agent and the defendants in error, had a right to repudiate the contract, and sue for damages sustained by the fraud. So, upon the other hand, if the buyer had been a private party or a business corporation, the fraud might be waived, and the contract affirmed, notwithstanding the corruption of the agent through whom it had been made. But it has been pressed upon us that, inasmuch as the agent corrupted was a public agent, the contract made through his corruption was absolutely void, and incapable of ratification, and that no subsequent conduct of the plaintiff in error in retaining and using the machines bought can furnish a basis upon which the guilty party can maintain a suit founded upon the corrupt contract. It seems to us that this argument confounds the corrupt agreement between the agent of the city and the other principal with the contract between the principals. There can be no question about the ratification of the arrangement for a commission. No one pretended to act for the city in bargaining for or receiving an illicit commission. "The principle of ratification only applies where the agent had professed to contract for the person who afterwards ratifies." Leake, Cont. 391.

The question we have to deal with is this: Can the city, notwithstanding the surreptitious dealing between its agent and the seller, waive the fraud as a private individual might and ratify the purchase? This is not a purchase of property from an agent or officer of the city. Neither is it a purchase of property in which any such agent or officer has an interest. It is simply a case of where an agent for the purchase of property from one capacitated to deal with the city is given a gratuity, reward, or commission by

the seller, which tended to give that agent an interest conflicting with fidelity to his principal.    Upon this discovery of this improper inducement operating upon its agent, the city had a right to repudiate the purchase and return the property bought.    This right it might exercise without regard to any actual injury it had sustained, and without regard to the effect of the allowance of the commission upon the integrity of its agent.    Harrington v. Dock Co., cited above, and Lister v. Stubbs, 45 Ch. Div. 1.    Under such circumstances, a contract, neither immoral nor prohibited, between private parties, would not be incapable of affirmance and enforcement by the principal who had been defrauded.    The innocent principal would have an option to affirm or avoid it, on discovery of the facts.    The authorities upon this are clear and numerous.    Wald's Pol. Cont. 247; Leake, Cont. 409.

The learned trial judge was of opinion, and so instructed the jury, that, upon discovery of the improper dealing with its agent, the city might repudiate or affirm the contract as it should elect. We entirely agree with him in this.    The contract it made was neither malum in se nor malum prohibitum.    No question of public policy is involved by a ratification of the bargain.    That involves no affirmance or adoption of the corrupt agreement for illicit commissions.    Upon the contrary, it would have the right to hold the agent liable as for money had and received to its use.    It might go still further, and sue the seller for the fraud, and recover all damages consequent upon an improper dealing with the buyer's agent.    It would be no answer to a suit by the city for a breach of the contract, as to the automatic operation of these separators, to say that the agent of the plaintiff had been corrupted by the defendant, and induced to make the contract through improper considerations.    The buyer, not being a party to the corruption of its own agent, has the undoubted right to enforce the contract.    Clearly, the court would not be aiding in the enforcement of an illegal or corrupt contract if the city was not in pari delicto and the agreement in itself was unobjectionable.    The fact that unlawful means were adopted to induce a contract which is lawful itself, and capable of being lawfully performed, does not of itself make the contract unlawful as to the innocent party, nor does any principle of public policy forbid the enforcement thereof by the defrauded principal.    The unlawful means by which the seller induced the buyer to deal with him is a matter collateral to the principal agreement.    We recognize the general rule that money or property paid or delivered on an unlawful agreement cannot be recovered back.    That principle, as stated by Lord Mansfield, in Holman v. Johnson, 1 Cowp. 343, is this:

"The principle of public policy is this: 'Ex dolo malo non oritur actio.' No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If from the plaintiff's own stating, or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant was to bring his action

against the plaintiff, the latter would then have the advantage of it; for, where both are equally in fault, 'potior est conditio defendentis.' "

"The test for the application of this rule is whether the plaintiff can make out his case otherwise than through the medium and by the aid of an illegal transaction to which he was himself a party." Wald's Pol. Cont. 332.

. This principle has no application here. The city was not a party to any illegal or unlawful or immoral agreement. If it were a plaintiff suing upon a breach of warranty contained in the contract in question, it would not be obliged to make out its case "through the medium and by the aid of any illegal transaction to which it itself was a party." The contract between the city and the sellers of these chattels was neither malum in se nor malum prohibitum. It is therefore enforceable by either party, unless the unlawful dealings between the agent of one of the parties and the other principal is a ground for rescission. If the contract was one which the city could have lawfully made or authorized in the first instance, then it is one which, if made by an unauthorized agent or through the fraud of its agent, to which the other party was alone privy, it may ratify upon full knowledge of all the facts. State v. Buttles, 3 Ohio St. 309. The case last cited affords an interesting instance of the power of a principal to ratify an act of an agent wholly unauthorized, and which the agent was by law prohibited from doing. Certain agents for the state of Ohio had loaned the state's money, and taken a bond therefor, payable to them as agents for the state. The lending of the state's money was prohibited under a penal statute. The state, through its legislature, ratified this unlawful act, and sued at law on the bond. The opinion was by Ranney, J., who, among other things, said that the state had a perfect right to waive the wrong, and adopt the contract made in her name:

"If, when adopted, the consideration upon which it was made, or its performance by the other party, is found to be illegal or immoral, it will no sooner be enforced for her than for the most obscure citizen; but, if it then stands without objection in both these particulars, it is no defense to say she was wronged by her agents, when they assumed, without authority, to act in her name. That is a matter between her and her agents. The option whether she will make herself a party to their acts, and be bound by the contract they have made, belongs to her, and not to those who have not and could not have been injured. In short, any contract that an individual or body · corporate or politic may lawfully make they may lawfully ratify and adopt, when made in their name without authority; and, when adopted, it has its effect from the time it was made, and the same effect as though no agent had intervened. The state could lawfully have loaned this money, and the defendant's testator could lawfully have bound himself to repay it. If the contract has been ratified and adopted by the state, in judgment of law, the state did loan the money, and the defendant's testator did promise the state to repay it." State v. Buttles, 3 Ohio St. 322, 323.

The case of Milford v. Water Co., 124 Pa. St. 610, 17 Atl. 185, has been cited as entertaining an opposing doctrine. Rightly understood, it has no very forcible bearing upon this case. A statute of the state absolutely prohibited any municipality from entering into any contract in which members of the city council were concerned, and made participation in such a contract by members of the city government a penal offense. The city council contracted

with a wat r company for a supply of water for a term of years. A majority of the council constituted a majority of the directors of the water company. Subsequently, when the council contained none of the directors of the water company, rents were paid, and use of the water continued. The water company relied upon this as a ratification, and sued for other rents. It was held that the contract was void and incapable of ratification. The case seems to stand upon the principle that the party to be held by ratification must be capable, not only of doing the act at the time it is ratified, but at the time the act ratified was done. Wald's Pol. Cont. 108; Cook v. Tullis, 18 Wall. 338. "Ratification relates back to the original making of the contract, and confirms it from that time." Leake, Cont. 393. The town was incapable of making a contract with that water company when it was made, and while it might, at the date of ratification, have made a new contract, it was held incapable of confirming the old one.

We do not agree with the trial judge that the evidence of ratification, after full discovery of the fraud, was so clear as to leave no issue for the jury. The city did by letter repudiate the agreement, and notify the sellers to remove the machines. This it had a clear right to do. But it is said that, while the city said it would not be bound by the bargain, its acts in retaining and using them thereafter was inconsistent with rescission, and amounted to ratification. Undoubtedly, the subsequent retention and use of these machines was evidence tending to contradict the letter repudiating the purchase. Dodsworth v. Iron Works (Feb. 5, 1895) 66 Fed. 483. In the case last cited, a like repudiation of an agreement for failure of machinery to comply fully with precedent conditions was held to have been rendered nugatory by subsequent conduct. But in that case there was a subsequent continued use for more than two years, in the ordinary course of the buyer's business, which was held such clear evidence of an intention to accept as to leave no issue of fact for the jury. The city could not be held estopped by ratification until after full discovery of the fraud. A mere suspicion was not enough to put it to an election. Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163. The letter of November 18, 1890, was written as soon as any satisfactory evidence of the improper dealing with its agent came to its knowledge. There was evdience tending to show that between that date and the bringing of this suit (January 16, 1891) the city had continued to use at least some of these machines. Such use would, of course, be evidence of an intention to affirm a contract otherwise avoidable for fraud. But this use was for less than two months, and falls in that respect far short of a like retention and use held to be conclusive in Dodsworth v. Iron Works, which we have before cited, and was not an act determining the intention to ratify so conclusively as to leave no question for the jury. Slight acts of use will not bar rescission. Bigelow, Frauds, 434, 435. In a case of this kind, where a public municipality has been defrauded, there ought to be, where mere acts are relied upon as evidence of ratification, such clear evidence of an intentional exercise of the right of ownership as would be incon-

sistent with any other theory than that of an intention to waive the right of rejection. The question of ratification should have been submitted to the jury.

Finally, if the city is found to have ratified the contract, it would operate as a confirmation of the trade as originally made. If representations were made by Brooks as to the automatic operation and general capacity of these machines to perform the work needed, and thus induced the purchase, these representations, in case a right to rescind is found to have been waived, may be treated as warranties made by the agent of defendants in error. Ratification operates as an adoption of the entire agreement and all of its parts. If the sale was upon a guaranty, or under representations amounting to a warranty, ratification confirms it subject to the guaranties of warranty, and the buyer may, when sued for the purchase price, recoup to the extent of any damage sustained by breach of the contract with respect to any warranty concerning the capabilities of the machine. The case of Dodsworth v. Iron Works, heretofore cited, controls this aspect of the case.

For the error indicated, the judgment must be reversed.