Campbell, Chief Justice,
delivered the opinion of the court:
The claimant sues for an alleged balance upon the contract price of letter boxes delivered to the defendants under the contract, a copy of which is attached to the petition. The contract was annulled by the Government in June, 1903, after a large number of the letter boxes of different sixes as called for in the contract had been furnished. Payments had been regularly made until about the time of the annulment, and at that time there remained unpaid upon the contract price of the letter boxes furnished the sum of $32,331.90. There was due to the subcontractors who manufactured the boxes, for the contractor the sum of $18,227.40, which was subsequently paid by the Government under a special act of *438 Congress authorizing it, and the balance, $13,917, is now sued for in this action.
The defense relies upon the illegality of the contract and proceeds upon the line that the contract was procured by fraud or through improper influences; that it was violative of the statutes; that it was in contravention of public policy; and, further, that Machen, the superintendent of the free-delivery system, was interested pecuniarily in the contract or had received gratuities which gained his influence in securing the contract. Either of said matters, if true, would furnish grounds for condemning the contract. The Government filed an extensive answer, alleging the different matters of defense above referred to, and the claimant in a long replication denies all allegations and charges of fraud. The replication, which is a part of the record, does not enter into explanations of matters charged in the answer as acts of misconduct or fraud, but contents itself principally with emphatic denials.
The execution of the contract being admitted the burden of proof as to the alleged frauds rests upon the defendants. It has been said that the evidence in a suit to annul a contract on the ground of fraud alleged to have been practiced by a defendant upon a plaintiff and upon which to found a decree in such a case “must be clear and satisfactory. It may be circumstantial, but it must be persuasive.” Lalone v. United States, 164 U. S., 255; United States v. Iron Silv. Min'g Co., 128 U. S., 673.
The evidence should be sufficient to reasonably satisfy the jury of the truth of one or the other of the defenses relied upon. Rea v. Missouri, 17 Wall., 532; Bigl. Fraud, 474. It is not required in cases of this kind, as in criminal cases, to prove a conspiracy between the Government’s agent and claimant or his associates, or to prove any of the several matters offered as defenses beyond a reasonable doubt. The rule is that where a party has the affirmative he must make out a prima facie case or one at least sufficient to shift the burden of proof to the other side, and therefore “ a prima facie case, with nothing to rebut it, is a case made out.” Butler v. Maples, 9 Wall., 766, 778.
*439 If the contract here sued on was procured directly or indirectly by or through the unlawful, corrupt, or other improper influence of the then superintendent of the free delivery system, with the knowledge or connivance, express or implied, of the claimant, the contract is fraudulent, and the court will not enforce it. And it does not materially alter the question whether said superintendent had a financial interest in the contract or the profits supposed to flow therefrom, or was actuated by gratuities furnished him by claimant, or by the hope thereof, for in either case the law will not tolerate a breach of trust on the part of a public official or allow such breach to be made the basis of an action.
It has accordingly been held to be against public policy to enforce a contract between two parties where the consideration involved the violation by one party, as agent, of a duty he owed his principal to act for and represent the latter. Oscanyan v. Arms Co., 103 U. S., 261.
While an agreement to procure such a contract is void as against public policy, equally strong and perhaps stronger, is the reason in law for saying that if the parties succeed in securing a contract with the Government by virtue of the fraudulent agreement that the agent shall aid in its procurement, and because of the agent’s activities under such agreement, the Government on discovering the fraud may annul the contract, and the courts will not aid in enforcing it. In either case the contract comes under the denunciation of that class of frauds which have been declared to be an “ unmixed evil.”
The reason of the rule inhibiting a party who occupies confidential and fiduciary relations toward another from assuming antagonistic positions to his principal in matters involving the subject matter of the trust is sometimes said to rest in a sound public policy, but it also is justified in a recognition of the authoritative declaration that no man can serve two masters; and considering that human nature must be dealt with, the rule does not stop with actual violations of such trust relations, but includes within its purpose the removal of any temptation to violate them. Hence the principal, on being informed of the participation of his agent on *440 his own account and interest in a transaction wherein there was an obligation to represent the principal, may disaffirm the contract so entered into without reference to any actual damage to the principal or benefit to the agent. It is, in such cases, the breach of the agent’s or trustee’s duty toward those he has undertaken to represent which gives the right of disaffirmance and not the quantum of damage to the one or the amount of benefit to the other. The rule is in nowise relaxed when the actions of public officials are involved. Recognizing that the freedom of contract should not be too much abridged, the law does not prohibit a Government official from contracting with or becoming interested in a contract with the Government which does not affect the duties imposed upon him by his office, but where the matters contemplated by the contract or the execution of it on the Government’s part are directly imposed upon him the official may not assume the dual relation of acting as the representative of the Government and for himself or his associates. City of Findlay v. Pertz, 66 Fed., 427.
Section 1781, Revised Statutes, makes it a misdemeanor for any officer or agent of the Government to take, receive, or agree to receive, directly or indirectly, any money, property, or other valuable consideration whatever from any person for procuring or aiding to procure a Government contract, and likewise makes it a misdemeanor for any person to offer, or agree to give, or to give or bestow any money, property, or other valuable consideration for the procuring or aiding to procure such a contract. This statute is comprehensive and its meaning is clear. No right growing out of a contract made in violation of a penal statute will be enforced by the courts at the instance of a party participating in the wrong. Powhatan v. Appomattox, 24 How., 247 ; 9 Cyc., 476 and cases there cited. See also Rev. Stat., secs. 412, 5440. “Whether forbidden by statute or condemned by public policy the result is the same. No legal right can spring from such a source. They are the sappers and miners of the public welfare and of free government as well.” Meguire v. Corwine, 101 U. S., 108; Triest v. Child, 21 Wall., 441; Oscanyan v. Arms Co., 103 U. S., 261.
*441 In Tool v. Norris, 2 Wall., 45, it is said:
“ Considerations as to the most efficient and economical mode of meeting tbe public wants should alone control in this respect the action of every department, of Government. No other consideration can lawfully enter into the transaction so far as the Government is concerned. Such is the rule of public policy, and whatever tends to introduce any other elements is against public policy.”
In the case before us the evidence is largely circumstantial. “But to establish fraud it is not necessary to prove it by direct and positive evidence. Circumstantial evidence is not only sufficient, but in most cases it is the only proof that can be adduced.” Rea v. Missouri, 17 Wall., 532.
Speaking of circumstantial evidence in cases involving charges of fraud, the Supreme Court declared in Castle v. Bullard, 23 How., 172, that such actions necessarily give rise to a wide range of circumstances, for the reason that the intent of the defendant is more or less involved in the issue, and great latitude is justly allowed by the law to the reception of such evidence, while objections to it upon the ground of irrelevancy “ are not favored,” because the force and effect of circumstantial facts usually and almost necessarily depend upon their connection with each other. Says the court: “Circumstances altogether inconclusive if separately considered may by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.”
In a later case where the issue was the existence of a conspiracy, Williamson v. United States, 207 U. S., 425, 451, Mr. Justice White, now Chief Justice, thus expresses the rule:
“The conclusion above expressed as to the admissibility of the evidence objected to is elucidated by Holmes v. Goldsmith, 147 U. S., 150, 164, where'it was said:
“ ‘As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and, therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be. “ The competency of a collateral fact to be used as the basis of legitimate argument is not to *442 be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend even in a slight degree to elucidate the inquiry or to assist, though remotely, to a determination probably founded in truth.”
“‘The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused.’ ”
Under the letter-box contract of 1897, made in the name of Maybury & Ellis, providing for furnishing the “ Clouse box,” the arrangement between them and Dr. Scheble was that they should have one half of the profits accruing and he the other half. This division was observed and Dr. Scheble was regularly paid his part. From within a few days after he commenced to receive payments or dividends from Maybury & Ellis, Dr. Scheble paid gratuities to August W. Machen, then superintendent of free-delivery system, who was charged with the duty of determining the number of letter boxes to be ordered by the Government. These gratuities continued at intervals — bearing a close analogy to the times of the receipts of payments by Dr. Scheble from Maybury or “ Maybury, trustee,” until after the contract of 1901 for letter boxes now under consideration was made. The first gratuity to Machen was a payment by Scheble upon a $3,800 debt which Machen owed a bank in Toledo dating back to 1889, and it was given within a few days after Scheble received his first dividend from Maybury & Ellis. Other of these gratuities from Scheble to Machen are exactly half of the dividend received by Scheble, and follow shortly after the receipt of the dividend by the latter. The findings of fact show the dates of the dividends to Scheble and of the gratuities to Machen. “A gratuity given to an agent for the purpose of influencing the execution of his agency vitiates a contract subsequently made by hirrp as being presumptively made under that influence,” per Lurton, circuit judge, in City of Findlay v. Pertz, 66 Fed., 434; Leake Contr., 409. The rule would be the same if Machen’s influence was thus secured or used to obtain the present *443 contract. Bey. Stat., 1781. The purpose being to ascertain whether or not a sinister influence known to claimant was at work which procured or aided in the procurement of the contract sued upon, or whether the superintendent of the free-delivery system had a personal or financial interest in said contract, it is competent to show the claimant’s connection with the earlier contracts as well as his connection with said superintendent. “ It is enough if these may tend even in a slight degree to elucidate the inquiry or to assist, though remotely, to a determination probably founded in truth.” Holmes v. Goldsmith, 147 U. S., 150, 164.
The contract of 1893, awarded to Maybury & Ellis for the term of four years, contemplated the furnishing of the Doremus letter box, and the claimant acquired a one-fourth, interest in the profits of that contract early in 1894, which should extend back to within a few months of the beginning of the contract. At that time the claimant controlled letters patent to the Clouse box, and the purpose of the arrangement as stated by Mr. Maybury was to enable Maybury & Ellis “ to have control of ” the Clouse box at the next bidding, then three years off. The explanation in claimant’s replication of the arrangement is as follows: “He admits that at one time an arrangement was made between Maybury & Ellis and this claimant by which they assigned to him a fourth interest in their said contract, the consideration thereof being a transfer to Maybury & Ellis of said letters patent numbered 494976 ” (the Clouse box).
What, then, was the arrangement ? Did it involve “ control ” of the Clouse box for the purpose of the next bidding, as Mr. Maybury says, or was it an actual “ transfer of the letters patent,” as the replication admits ? The distinction is important, not only as showing a material difference in the statements of the two principals, but also in the result as shown in the subsequent arrangement relative to the contract of 1897, and the inference may be drawn that May-bury & Ellis did not acquire either an absolute “ transfer ” or “ control ” of the Clouse box from the fact that at the 1897 letting the Clouse box was given the contract; and thereafter Maybtiry & Ellis paid the claimant one-half of the profits accruing from that contract. The profits to May- *444 bury & Ellis on the 1893 contract were approximately $27,000, of which they paid one-fourth to the claimant, making approximately $6,750.
Bearing in mind that Maybury & Ellis had declined to treat with Wade relative to the Clouse box, and very soon thereafter did treat with Dr. Scheble for it, and that there is no evidence showing that the claimant and Maybury & Ellis at that time were other than strangers to each other, we may scrutinize the transaction as stated by them. If they made an independent and bona fide arrangement in 1893 or 1894 to be available in 1897, why was it not available at that time? And if it was available, why the necessity of a different division of profits in 1897? If Dr. Scheble transferred his letters patent in 1894 to Maybury & Ellis in consideration of an interest in their then existing contract, by what right did he secure and what consideration did he pay for a one-half interest in the contract executed in 1897 by the use of the box the letters patent to which he had transferred? Maybury & Ellis paid him one-fourth under the former contract, and in consideration thereof secured “ control ” in bidding or “ transfer ” of the letters patent to the Clouse box; but in 1897 they bid upon both the Doremus and the Clouse boxes under an agreement that upon whichever box the contract was awarded they would divide one-half of the profits with the claimant.
A feeble explanation of the reason for dividing with the claimant the profits of the 1897 contract is made in the statement, “ If he had kept control of the box that was successful in the bidding and bid on his own account, our box would have been out.” And this explanation ignores the fact that it was the “ control ” or “ transfer ” which Maybury & Ellis acquired and paid for long before. The statements about .the earlier arrangement are faulty, or the explanation of the new agreement is wanting.
It, however, appears that shortly after the said arrangement in 1894 between said parties the orders for letter boxes, which had to be given by or through the Superintendent of Free Delivery, increased largely, because during the year 1894-5 orders were given for 9,215 boxes of size No. 1 as against 1,784 for the preceding year and 3,797 for the sue- *445 ceeding year, and that orders were given for 5,881 of size No. 2 for the year 1894-5 as against 854 boxes for the year 1893-4, and 1,747 boxes for the year 1895-6. The increase in the number of boxes of course increased the profits of the contractor.
We have spoken of the 1897 contract, which was again secured by Maybury & Ellis, who bid upon both the Dore-mus and the Clouse boxes, the latter one securing the award. Under that contract, as we have shown, large profits were made, which were divided equally between Maybury & Ellis on the one hand and the claimant on the other, the latter furnishing gratuities to said superintendent, as above stated. If Maybury & Ellis got a “ transfer ” of the letters patent to the Clouse box in consideration of a one-fourth interest in their profits on the 1893 contract, it does not appear that there was any consideration for their giving Dr. Scheble a half interest in the contract of 1897. We find him, however, expressing the utmost confidence in the Clouse box securing the contract, and that before the award of the contract he is inquiring as to the cost of the manufacture of the Clouse box, notwithstanding the admission in his replication of a “ transfer ” by him of the letters patent in that box to May-bury & Ellis.
As shown by the findings, objection arose to the Clouse box, and the Doremus box was substituted for it, though no change in the arrangement between Maybury & Ellis and Dr. Scheble was made when the change in the boxes occurred.
Maybury & Ellis were the contractors, and the Beading Stove Works were the subcontractors, who manufactured and made deliveries of the letter boxes as ordered by the department under the 1897 contract, and the contract between the contractors and subcontractors provided among other things that the latter should pay quarterly to the contractors the difference between the amount the Government was bound to pay and the amount the subcontractors were entitled to receive (in other words, the profits of the contractors), and these payments of profits were due quarterly if the boxes were ordered and were not to await payments by or deliveries to the Government. Therefore, when the Govern *446 ment sent its orders for tbe boxes to the contractors they transmitted the same to the manufacturer to be filled, and the latter had of course to await manufacture and inspection of the same before receiving their pay, but in the meantime they were bound to pay or did pay the contractors the said profits. The method adopted by the Government at that time of making payments was that after inspection the boxes would be shipped to postmasters in different parts of the country, who would make payments to the contractors; but a change in this system was adopted at the instance of the Superintendent of Free Delivery, whereby the payments were by Treasury warrant drawn by the Assistant Postmaster General payable to the contractors. Under the earlier method the Government would receive the boxes before payments were made; under the latter method payments might be made and were made before receipt by the Government of the boxes. This is emphasized by the fact that on June 14, 1900, the department, acting through the said superintendent, gave an order for 6,000 letter boxes, and said superintendent caused the same to be receipted for on June 30, 1900, by one McGregor, one of whose duties was to receipt for letter boxes delivered by the contractors or their subcontractors.
At the time of giving this receipt for boxes their manufacture had not begun, though they were paid for in a few months thereafter at a time when not exceeding one-third of them had actually been delivered to the Government; and in September, 1900, the department, again acting through said superintendent, had ordered 6,000 additional boxes, the shipment of which was not completed until more than a year thereafter, but they were paid for by the Government before any of them were shipped. The change in the method of payment, which change was brought about by said superintendent, made possible tins action. In the meantime, however, and before the Government had paid for the boxes the subcontractors had paid to the contractors the profits which would accrue on the two orders of 6,000 boxes each, of which the claimant received one-half, which was distributed by *447 him, as hereinbefore shown, in the form of gratuities to the said superintendent.
An explanation of the order for 6,000 boxes, and the receipt thereafter as though actually delivered in June, 1900, is attempted to be made on the theory that the fiscal year ended on June 30, and that the order was made in order to cover an unexpended balance of the annual appropriation for letter boxes, and that the practice of the auditing department in construing section 3690 of the Revised Statutes had been to allow credits under the appropriation for a different year for supplies ordered during that year; or in other words, that the date of the order for goods and supplies and not the date of their delivery was the controlling factor in determining what year’s appropriation was chargeable with the expenditure. One difficulty about the explanation is that the- practice referred to is clearly stated in 6 Comptroller Decisions, 815, wherein the comptroller on April 18, 1900 — two months previous to the order and receipt of June 30 — rendered a decision contrary to said contention; and if the said superintendent did not have knowledge of this decision it at least furnished no reason for giving a receipt for 6,000 boxes before the manufacture of them had begun; nor does the fact of trying to use the appropriation under the circumstances disclosed, because the superintendent knew that an appropriation bill had already passed and was approved June 2, 1900, 31 Stat. L., 257, covering the subject, providing for free-delivery .service, and carrying a special appropriation of $200,000 for incidental expenses, including, among other things, letter boxes, etc., for the fiscal year ending June 30, 1901. With this information before him the reason for the superintendent’s rush order of June 14 and receipt of June 30 calls for some other explanation than that offered in argument. It was impossible to secure payment for the boxes until they were receipted for. The explanation offered furnished no excuse for the indorsement on the “jacket” that the bill for 6,000 letter boxes was correct for “expenditures incurred in second quarter of 1900,” because as a matter of fact the order was given in the fourth quarter of the then fiscal year.
*448 The answer of the defendants alleges that claimant was among Machen’s acquaintances and intimates in Toledo, which is met with the denial “ he denies that he was intimate with said Machen or that he was anything more than an acquaintance.” But we find the claimant systematically paying to Machen moneys with regard to which no explanation is offered by either of them, and these payments continued at least until after the contract of 19 91 had been awarded.
When the time for letting the contract of 1901 arrived and bids had been called for an arrangement had been made by claimant and the said Maybury that the latter, representing Maybury & Ellis, should bid upon the Doremus and the Clouse boxes, and if either of them got the contract the claimant should have one-half of the profits on the contract. But Dr. Scheble, in the name of the Michigan Steel Box Co., put in a separate bid on what is called the J. M. Clouse box. As the boxes called for by the contract subsequently awarded were to be made of steel, we may say in passing that it is probably a mere coincidence that the claimant selected the name of the Michigan Steel Box Co. upon which to base a bid.
At the first opening of bids they were all rejected upon the recommendation of the committee of awards.
Between the dates of the two openings of bids (February and March, 1901) the claimant is shown to have had conversations with one Prizer; and during his testimony the said Prizer answered the following question on cross-examination : “ Now, let me ask you, Mr. Prizer, the direct question whether Dr. Scheble advised you in Washington that through influences at his command they would be able to secure the acceptance of one or the other of the bids for letter boxes, and whether or not it was Mr. Maybury who made that statement? ” “Answer. That statement was made to me by Dr. Scheble and also by Mr. Maybury.”
The circumstances of the rejection of the bids in February, 1901, are shown in the findings. The said Prizer made no bid, being induced thereto, as he states, by statements of claimant. Maybury & Ellis had an agreement with Scheble with reference to the Doremus and Clouse boxes, which they *449 were bidding upon, and two or three days before the first opening of bids Maybury wrote to Prizer, saying, “ You will meet in Washington also a Dr. Scheble. It is enough for me to say that he is very influential in the matter and whatever he says will be authoritative.” A short time thereafter he again wrote Prizer: “ I went to Washington a week ago Saturday and found the lay of the land. I believe there is no question but what the Government will adopt steel.” Maybury & Ellis were then jointly interested with Scheble in the contract of 1897, and they were interested with him in securing, as they thought, a contract on the Doremus or Clouse box.
When asked about the meaning of said letter to Prizer, Maybury thus states: “You spoke of Dr. Scheble being influential?” “Answer. Yes; Dr. Scheble seemed to be the best-posted man upon letter boxes I had ever talked with and gave it more attention and seemed to keep track of inventions and in advancing the interests of any box. A man who had such knowledge of the construction and adaptability would have an influence.” “ Question. As to the use of the word ‘authoritative?’” “Answer. That was based upon only the idea that whenever he had bargained with me, where other patentees, if there were any involved, he always took it upon himself to assume the premise, and I never knew his authority to be questioned by anybody.” As this is the only explanation of the letter, we repeat it as rendered.
The letter which found its way to the committee on awards containing objections to letter boxes of a certain type went to that committee from the source that the bids went from, as they were addressed in care of the superintendent of free delivery. It furnished a basis for discarding the Doremus box, when as a matter of fact that- box had given more general satisfaction than any other box which the Government had had. Yet it is shown that that letter had been corrected in its statements so as to make it apply to the Clouse box and not to the Doremus box. It is significant that the chairman of the committee on award was Thomas W. McGregor, who owed his promotion to Machen, *450 and who, as disclosed by the record in this case, was under Machen’s influence, and that the information which the committee sets out as a reason for discarding cast-iron boxes on account of breakages could readily come through said chairman, because the knowledge and information as to breakages were within the department in which he was engaged. The committee did not give the source of its information that the breakage of cast-iron mail boxes “is about 14 per cent”; and it was inaccurately advised from some source, because the records of the department for 1899 and for 1900 show that the percentages of breakages, if all boxes reported as unserviceable be treated as broken boxes, did not exceed 4 per cent, instead of 14 per cent, as stated in the reply, while the difference between the “unserviceable” boxes reported in 1901 and those reported in 1900 makes the percentage less than 1 per cent. It is argued for claimant to be “ entirely possible that when the committee made its report, stating that there was a breakage of 14 per cent, they intended to say 4 per cent, for even 4 per cent was a large percentage.” But the fact is the committee said 14 per cent; their report, addressed to the Postmaster General was for his information, and its conclusions, if erroneous, would necessarily mislead him. We do not impeach the good faith of a majority of the committee, who no doubt acted on the information before them. And notwithstanding this condemnation of the Doremus box, the claimant seemed to have so much faith in it that after being awarded the contract for a steel box of the new design he made an arrangement with Maybury & Ellis whereby in consideration of the right to use the Doremus box in case the department changed from the one upon which the contract was then awarded he would pay to Maybury & Ellis one-sixth of the profits accruing under his contract,, and he did thereafter pay them one-sixth.
It therefore appears that the claimant acquired an interest in the contract of 1893, as above stated, and that a large increase in the number of boxes called for by the department arose shortly following his acquisition of a one-fourth interest in that contract; that he had a one-half interest in the 189T contract, and that, immediately following his receipt *451 of dividends from that contract, he furnished gratuities to the superintendent of free delivery; that said superintendent had the duty of determining the needs and the matter of distribution of letter boxes; that claimant’s relations with him were of an intimate character during the periods covered by said contracts; that claimant conveyed the impression to others of having an undue influence with that official; that he participated in and knew that said official was deriving gratuities from the profits of an order for 6,000 or more boxes before they had been inspected or delivered to the Government; that before and after the award of the contract in question he was paying or giving said official moneys received from one or the other of said three contracts; that he spoke confidently of his box securing the contract, though it was inferior to and less desirable than the letter box then in use; that he induced one Prizer not to bid at the last letting of the contract; that he secured the services of a Government postmaster, and gave him an interest in the contract to aid in its procurement; that he knew that misleading and false information had been acted upon by the committee on award; that after said contract was awarded to him or the Michigan Steel Box Co. he continued to pay gratuities to said superintendent; that he told one of the joint owners with him in the letter box upon which the first bid of the Michigan Steel Box Co. was made for the 1901 contract that he would have to give said superintendent a part of the proceeds of sale of interests in said box; that he knew that after said contract in suit was made said superintendent sent to inspect the boxes and receive them for the Government an especial friend of said superintendent. No inference prejudicial to claimant is drawn from the fact of his indictment, particularly as there was entered by the Government a nolle frosegui upon it.
The inferences to be drawn from these facts are strengthened by the fact that the claimant does not testify in the case and offers no explanation of charges which find support in the tendencies of the evidence. The charges made are of the most serious nature because, if true, they impeach the claimant’s respect for the law itself. But the claimant remains silent, and his silence under the circumstances is *452 unexplained and may be unexplainable except upon the theory that by testifying he might make bad matters worse. The rule of law upon this question is thus stated in Kirby v. Tallmadge, 160 U. S., 379, 383:
“As they had it in their power to explain the suspicious circumstances connected with the transaction, we regard their failure to do as a proper subject of comment. ‘All evidence,’ said Lord Mansfield in Blatch v. Archer, Cowper, 63, 65, ‘is to be weighed according to the proof which it was in the power of one to have produced and in the power of the other side to have contradicted.’ It would certainly have been much'more satisfactory if the defendants, who must have been acquainted with all the facts and circumstances attending this somewhat singular transaction, had gone upon the stand and given their version of the facts. McDonough v. O'Neil, 113 Mass., 92; Commonwealth v. Webster, 5 Cush., 295, 316. It is said by Mr. Starkie, in his work on Evidence, volume 1, page 54: ‘ The conduct of the party in omitting to produce that evidence in elucidation of the subject matter in dispute, which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion- for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.’ ”
We are reasonably satisfied from the evidence and the failure of the claimant to offer any explanation of matters, the absolute knowledge of which rests with him, that the said contract is tainted with illegality and fraud and must be condemned. It therefore furnishes no right of action.
The only evidence offered as to the value of the boxes is the contract itself, and while a contract price does sometimes furnish the basis for ascertaining the value upon a quantum meruit we think the court should decline to receive it here as sufficient evidence, because if the contract be of the kind we have denounced the claimant should not be allowed to leave the court with the full benefits of the contract, the result of a fraudulent scheme. In other words, he should be required to prove the value of that which the Government received. To condemn the contract and yet give the claimant the full contract price in the absence of any other proof would be to deprive the principle involved of any practical application. The Government paid for a large number of boxes and paid the manufacturer its price for the *453 manufacture of the boxes now in question, and tbe only thing remaining is whether the claimant shall be allowed to recover his profits on these boxes.
An additional reason for refusing him the right to recover is that though he alleges himself to be the sole owner of the claim and makes affidavit to his petition, the facts show that the Michigan Steel Box Co. was an association composed of several persons, who under the terms of the contract would be entitled to a part of its profits and that, therefore, the claimant would not be entitled to all of them. These parties are not before the court.
We think the petition should be dismissed, and it is so ordered.