DOUGLAS BRACKEN, Plaintiff, v. GEO. H. JACKSON, Defendant, Appellant.

**Agency:** REAL ESTATE BROKER: FRAUD: EVIDENCE. In this action against a real estate broker for fraud the evidence is reviewed and held to show that defendant, who was employed to find a purchaser, fraudulently procured a conveyance of the land to himself and sold it to a customer at a higher price, thus authorizing submission of the issue of fraud and recovery of damages by the owner.

**Pleadings:** MOTION TO STRIKE: REVIEW. Where a defendant made no objection to an amended and substituted petition at the time of its filing, but filed answer thereto and informed the court that he was ready to proceed, a motion to strike the amended petition after verdict, which was not ruled upon by the trial court, is not reviewable on appeal.

**New trial:** NEWLY DISCOVERED EVIDENCE. Newly discovered evidence which is merely cumulative, or immaterial, or without probative force, does not require the granting of a new trial.

**Agency:** DUTY OF AGENT: FRAUD. An agent is required to deal fairly with his principal in all respects; he cannot speculate on the property of his principal without his knowledge, and must account to him for all profits realized on property acquired by fraud upon his principal, regardless of whether the principal has suffered any loss by the transaction.

*Appeal from Floyd District Court.*—HON. C. H. KELLEY, Judge.

SATURDAY, APRIL 12, 1913.

ACTION to recover damages in the sale of land; plaintiff claiming that the defendant was his agent and fraudulently procured him to make a deed to the agent, the agent concealing the fact that he had already procured a purchaser for plaintiff's land in excess of the amount paid by defendant therefor. Judgment for plaintiff *Affirmed.*

*J. C. Campbell* and *W. H. Salisbury,* for appellant.

*J. H. Lloyd,* for appellee.

GAYNOR, J.—The plaintiff for cause of action states: That on or about September, A. D. 1909, and prior thereto, under verbal contract, he employed the defendant, Geo. H. Jackson, to contract and sell a certain tract of real estate owned by this plaintiff and situated in Floyd county, Iowa, and described as follows: The S. E. ¼ of section 36, township 97, range 17, and the S. W. ¼ of section 31, except east thirty-eight acres in township 97, range 16, containing two hundred and fifty-seven acres more or less. That the defendant, Geo. H. Jackson, was to receive for commission in contracting and making sales of said premises for this plaintiff the sum of $1 per acre. That in pursuance of said contract, and on or about September 12, A. D. 1909, the defendant, Geo. H. Jackson, as agent of this plaintiff, represented and stated to plaintiff that he had a customer or purchaser for said land from Iowa Falls, Iowa, at $65 per acre, saying to this plaintiff that $65 per acre was the highest and best price he could obtain for said land from said customer or purchaser, and that $65 per acre was the highest price obtainable for said land. That this plaintiff believed and relied upon said statements and representations, as made by the defendant, Geo. H. Jackson, and consented to make sale of said land. That, in pursuance of the said statements and representations

made by the defendant, a deed was executed for said premises by the plaintiff, on or about September 14, A. D. 1909. That, at the time of the making of said deed, this plaintiff believed that a sale of the said land had in fact been made by the defendant to some *bona fide* purchaser. That, when said deed was presented to this plaintiff for his signature, plaintiff noticed that defendant's name was inserted in said deed, as grantee, and plaintiff was informed that it was inserted in said deed for convenience and on account of certain attachments out against said land, and on account of certain mortgage indebtedness out against said land. That in truth and in fact, at the time the defendant made the statements and representations to this plaintiff with reference to having a purchaser for said land at $65 per acre, and $65 per acre was the highest and best price obtainable for said land, the defendant, in truth and in fact, had not procured a *bona fide* purchaser for said land at $65 per acre. That, by the insertion of the defendant's name in said deed as grantee, the defendant obtained the legal title of said land in fraud of this plaintiff's rights. That the representations and statements of the defendant, made to the plaintiff as aforesaid, were false, and defendant knew them to be false at the time he made them to this plaintiff, and the same were made for the purpose of obtaining plaintiff's signature to a deed for said premises. That the said false statements and representations were made to this plaintiff by the defendant while the defendant was acting as plaintiff's agent. That this plaintiff believed said statements and representations and relied thereon. That, had the plaintiff known that defendant was the contemplated purchaser, he would not have consented to said sale at $65 per acre. That before the plaintiff had signed said deed, the defendant was endeavoring to negotiate a sale of said land to one T. M. Leslie, and said T. M. Leslie was examining said land with a view of purchasing same at $70 per acre, and the defendant in no manner informed this plaintiff of the fact that negotiations were pending for the sale of said land to

T. M. Leslie at $70 per acre. That shortly after the defendant acquired the legal title to said land, and on the same day, the defendant sold the same to said T. M. Leslie at $70 per acre. That because of the relations of principal and agent existing between the plaintiff and defendant, and because of the fraud practiced upon this plaintiff by the defendant, as hereinbefore stated, the defendant held the legal title to said land in trust, and the defendant is accountable to the plaintiff for the advance price for said land and for the full value of $70 per acre. That on account of the fraud, concealment, dishonesty, and unfaithfulness of the agent, Geo. H. Jackson, as hereinbefore stated, the said Geo. H. Jackson has forfeited all of his right to claim compensation of $1 per acre for the sale of said two hundred and fifty-seven acres of land described in the petition herein. That the defendant now wrongfully and fraudulently detains from this plaintiff the sum of $6 per acre on the said sale of said two hundred and fifty-seven-acre tract of land, making $1,542 wrongfully and fraudulently retained by the defendant from this plaintiff. That there is now $1,542, with 6 per cent. interest thereon from and after September 14, A. D. 1909, due this plaintiff from the defendant: Wherefore the plaintiff asks judgment against the defendant for the sum of $1,542, with 6 per cent. interest thereon from and after September 14, A. D. 1909, and for costs of this action. That thereafter the defendant filed in said cause his answer to said amendment and substituted petition as follows:

Comes now the defendant and for answer to plaintiff's amended and substituted petition denies each and every allegation therein contained, except as hereinafter admitted or qualified, and admitted, or qualified and denied. Defendant states that on the 12th day of September, 1909, he purchased said farm from plaintiff and received deed thereto from plaintiff and his wife about 8 o'clock a. m., December 14, 1909. That he made no false, wrongful, or fraudulent statement to plaintiff in securing title to said land, and did reveal to

plaintiff all knowledge he had as to its value, and in no way
defendant intended to defraud plaintiff. That he himself
was a *bona fide* purchaser of said land from plaintiff, and so
told plaintiff at time, and plaintiff knew defendant was buy-
ing said land from plaintiff on defendant's own word, and
for defendant and certain of his business associates in Iowa
Falls and Floyd county, to wit, A. R. Sullivan and T. W. Jack-
son, of Iowa Falls, and C. W. Schermerhorn, of Floyd, Iowa,
for $64 per acre. Defendant admits that, after he had pur-
chased the said land, that he did transfer and sell the same
to T. M. Leslie for $70 per acre. Defendant states that the
price he agreed to pay, and did pay for said land, to plaintiff
was $64 per acre. That, at the time he purchased said land,
defendant was not the agent of the plaintiff, but was acting
for himself, which fact was told to plaintiff by defendant and
was known to plaintiff.

The first question raised by the defendant on this appeal
is, that the court, at the conclusion of the testimony, should
have instructed the jury to return a verdict for the defendant
on the grounds that the evidence was wholly
insufficient to justify the jury in finding in
favor of the plaintiff on any theory of the
evidence. A determination of this question involves an
examination of the evidence submitted on the trial. From
this evidence it appears: That the plaintiff was the owner
of two hundred and seventy acres of land substantially as
claimed in his petition. That during the years 1903 and 1904
he listed these lands with the defendant for sale at $60 per
acre. That in 1907 and 1908, he listed it with the defendant
at $65 per acre. That in 1909 he listed it with defendant at
$70 an acre, and that during these years the defendant was
acting as agent for the plaintiff under a certain contract by
which he was to receive $1 an acre from the plaintiff in the
event he sold said land at the price at which it was listed.

1. AGENCY: real estate broker: fraud: evidence.

It appears from the testimony of the defendant that
during these years he acted as an agent for the plaintiff and
sought purchasers for the land at the list price, but had not

succeeded in procuring a purchaser. It appears that on the 10th or 11th of September, 1909, he had some talk with the plaintiff touching the land in controversy, but no definite agreement was arrived at with respect to the same between these parties. That on the 12th day of September, 1909, he visited the plaintiff with respect to this land, and there stated to him that he had been talking with a certain party about the land and had offered it to this party at $65 an acre and tried to have him enter into a contract to purchase it at that price. That this was the best offer he could make for it. That this party offered $65 an acre, but refused to enter into any binding contract. That he was not certain the party would take it, and there in the conversation made some proposition to the plaintiff to take the land himself, but it appears from the evidence that nothing was definitely agreed upon between the parties at that time, and there is conflict in the evidence as to what was said and done. The plaintiff claims that he was willing to let it go at $65 an acre because of his straightened circumstances if he could get no better price. That the defendant told him $65 was the best offer he had ever had for it. It appears further from the testimony that on Saturday evening, September 11th, he had telephonic communication with a firm by the name of Sullivan & Jackson, real estate agents, at Iowa Falls. What was said by the defendant to Sullivan & Jackson does not appear in the record, but it does appear that they told him to buy the land; that, after this conversation with Sullivan & Jackson over the telephone, he made this visit to the Brackens on Sunday the 12th. It appears that on Monday the 13th Mr. Jackson, of the firm of Sullivan & Jackson, appeared in Floyd and at defendant's bank, accompanied by one Mr. Leslie. That some talk was had at the bank, the substance of which is not shown in the record, but it appears that Jackson, accompanied by a Mr. Schermerhorn on the afternoon of the 13th, took Mr. Leslie out to look this farm over. That the defendant, Jackson, knew of this fact. It appears that he then prepared deeds for the plaintiff and his

wife to sign, conveying the land to him; that the next morning,
September 14th, about 6:30 in the morning, he delivered to
one Barney a deed conveying the land from the Brackens to
himself. That the deed was signed first by Mrs. Bracken some
time between 6 and 7 on the morning of the 14th. That, imme-
diately after the signing of the deed by Mrs. Bracken, Barney
returned to the bank with the deed and the defendant, Jack-
son, was there at the bank; that, under the direction of the
defendant, Barney started at once, a little after 7 o'clock, to
procure the signature of the plaintiff to the deed.

It appears that after the deed signed by Mrs. Bracken
was returned to the bank, and while Barney was absent for
the purpose of procuring the signature of the plaintiff, the
defendant herein, Leslie, and T. W. Jackson went back to
the farm; that they drove to the farm, examined it, and
returned. He says that, when he got back to the bank from
this trip, Barney was there with the deed. That then was the
first time he priced the farm to Leslie at $70 an acre, and
gave him the terms. That he immediately then went to his
stenographer in the adjoining room, drew up a contract
between himself and Leslie, and, after the contract was drawn,
Leslie signed it. That Leslie signed the contract about 12
o'clock on the 14th, or about five hours after the Brackens
had signed the deed to the defendant. It appears that Sulli-
van & Jackson and Schermerhorn were associated together in
the real estate business with the defendant.

Defendant says: ''I claim I bought the farm for us four.
I don't know as I told Bracken about us four. I told him
there was Schermerhorn and other parties at Iowa Falls
interested in the land. I didn't tell him the names of the
other parties. It was customary, whenever we bought a farm,
to put it in the name of one of us. I told Mr. and Mrs.
Bracken that these agents of ours at Iowa Falls were interested
with us, but I don't remember that I mentioned their names.
I had done more or less business with T. W. Jackson, of Iowa
Falls, for six or seven years. Schermerhorn had been in the

real estate business with me for some time. When I went out to see the Brackens that Sunday morning, I knew that they were in trouble financially."

It appears that Leslie had visited this farm the day before and had examined it. It does not appear what conversation or arrangement was had between the defendant, Jackson, and the other parties that he claimed were interested with him in the land prior to the making of the deed from Bracken to the defendant. He says: "When they drove up in front of the bank on the afternoon of September 13th, I told them that we had bought the farm and to bring on buyers, if they could find them, who wanted a stock farm." It appears, that, at the time this statement was made, Leslie was there in the company of Jackson, from Iowa Falls, and that on that same afternoon Jackson and Schermerhorn took Leslie out to examine the farm again. Whether it was necessary for this other examination or not in order to inform Leslie of the nature and character of the land does not appear.

The defendant testifies that he knew nothing of Leslie as a purchaser, or as to the amount Leslie was willing to pay, until about 11:30 of the 14th; but it does appear that the defendant got busy immediately after Leslie's arrival at the bank. That he prepared the deeds and tried to find Mr. Bracken on that evening, but failed, but the next morning, between 6:30 and 7 o'clock, he had the signature of Mrs. Bracken to the deed, conveying the land to him at $64 an acre. It appears that he waited, before going out with Leslie, until after he had seen the deed from Mrs. Bracken. That before 8 o'clock that morning he had Mr. Bracken's signature to this deed.

A. R. Sullivan, of the firm of Jackson & Sullivan, testifying for the defendant, says: "I first acquainted Mr. Leslie with the fact that the farm was for sale on the 13th day of September, about 10 o'clock in the forenoon. I got a phone message from Jackson on Saturday the 11th. The defendant and I did some business together. We were selling

land, bought some and sold some. I did not go to Floyd with Leslie. My partner, Jackson, did. They started from Iowa Falls about 11:35 on the 13th. I told Leslie about the farm about an hour before he took the train.''

T. W. Jackson, of the firm of Jackson & Sullivan, testifying for the defendant, says: ''I priced the land to Leslie on the 13th, Monday, at $70 an acre. On the morning of the 14th, we got back to the bank, from our trip to the farm, about 11 o'clock. I stayed in the bank until the papers were drawn up. I do not remember that the defendant and I talked over the deal before that time.''

Leslie, testifying for the plaintiff, says: ''I saw the Bracken farm once before I bought it, and I contracted for it on the first trip. I came here one day and bought it the next. I think it was on Monday I came, and I was shown the land that day and looked it over again the next. I understood that it was the Bracken farm we were looking at. The day before I went to the farm with Schermerhorn and we met Mr. Bracken, and Schermerhorn introduced him to me as the man who owned the farm. The day I went with Jackson, he talked to me about Bracken's circumstances, and said he was in bad circumstances and that something or other would have to go. He thought it a cheap piece of land at $70 an acre. At the time I signed the deed, Mr. Jackson said to me that he had several claims against the land and that it would be better for the deed to come through him than through Bracken. Bracken's business was in bad shape. Mr. Jackson told me, during the two days that I was looking at the farm, that he had stayed with Bracken a part of the night before to get him down to $70 an acre. He said Bracken held it at $75.''

The plaintiff testified that, when Barney came to him with the deed for his signature, Barney told him that Jackson had sent him to get the papers signed. That Jackson would take care of the attachments. That the commission was $1 an acre, and, ''when I asked him why the deed was

drawn to Jackson, he said it was for convenience on account of the attachments. This talk was on Tuesday. I had a talk with Jackson the Sunday before.'' Plaintiff further says that Jackson had never told him he would buy the farm himself. Jackson said he had a prospective buyer and the best he could get was $65 an acre. ''I said I supposed that, if he couldn't do any better, we might have to sell it.''

It is true that the defendant denies that he had any knowledge that Leslie would buy the land, or intended to buy the land, or that he would pay $70 an acre for the land, until after he had secured his deed from the Brackens. Leslie says that he contracted for the farm on the first trip. That was the evening of the 13th. That he actually consummated the deal on the next day. It appears that on Saturday evening he had a talk with Sullivan over the phone. That Sunday he visited the Brackens. That, on Monday following, Sullivan's partner appeared at defendant's bank with Leslie. That some conversation was had at the bank that afternoon. That Leslie was taken to see the farm that afternoon by parties with whom the defendant was associated in business. That by 6:30 the following morning, Tuesday morning, he had a deed prepared and signed by Mrs. Bracken conveying the land to him. That by 8 o'clock, he had the deed signed by Bracken. That he went to visit the farm with Leslie on Tuesday morning. That they got back about 11:30. That by 12 o'clock a contract was entered into between Leslie and the defendant, and it was for the jury to say, under the whole record, what the real truth of this matter was, or whether defendant had acted in good faith with the plaintiff in procuring the deed from the plaintiff to himself, and we think there was no error in submitting the case to the jury. It is next contended that the court erred in allowing the plaintiff to file an amended and substituted petition.

It appears that, upon the filing of the amended and substituted petition, the defendant filed a demurrer to the amended and substituted petition, which, being submitted to the court,

was overruled. That thereupon the court informed counsel for the defendant that if they were taken by surprise, or not ready to proceed under the issues thus tendered, he would grant them additional time to procure such evidence as they might need. That thereupon they informed the court that they were willing to proceed, and would stand on the record as made. That they filed an answer to the amended petition without taking any exception to the ruling of the court at that time, and, so far as this record appears, made no motion to strike the amended and substituted petition from the files, and did not file a motion to that end until the 23d day of October following, and long after the verdict had been returned by the jury. It does not appear that this motion was ever submitted to, or ruled upon, by the court, and no exception is taken to any action of the court in respect to this motion.

2. PLEADINGS: motion to strike: review.

Complaint is further made that the court erred in overruling defendant's motion for a new trial, based upon newly discovered evidence. A most casual reading of this record shows that no error can be predicated on the action of the court in respect to this matter. The affidavits filed by the defendant, tending to show that new evidence had been discovered upon the whole record, is shown to be wholly immaterial and cumulative. The witness making the affidavits upon which the defendant relies in a subsequent affidavit so modified his statement set out in the first affidavit that, when his statement as a whole is taken, it is barren of any probative force helpful to defendant's cause.

3. NEW TRIAL: newly discovered evidence.

When we consider the record in this case in the light of the well-established rules of law to the effect that it is the duty of an agent to deal fairly with his principal and give him full information as to all matters known to the agent which in any way affect the interest of his principal in reference to the subject-matter of his agency, that it is his duty to act in good faith,

4. AGENCY: duty of agent: fraud.

and not take advantage of his principal's necessity or situation, that he is not permitted to speculate in his principal's property without his principal's knowledge, that he must account to the principal for whatever profit he ultimately realizes from his principal's property, while acting as agent, that, where he is guilty of fraud, he is not entitled to recover even his compensation for services, we think there is no just ground for complaint on the part of the defendant. In support of this see: *Leonard v. Omstead,* 141 Iowa, 485; *Borst v. Lynch,* 133 Iowa, 567; *Rorebeck v. Van Eaton,* 90 Iowa, 82; *Keyes v. Bradley,* 73 Iowa, 589; *Stoner v. Weiser,* 24 Iowa, 434; *Steele v. Crabtree,* 130 Iowa, 313, at 317; *Vennum v. Gregory,* 21 Iowa, 326; *Braden v. Randles,* 128 Iowa, 653; *Gregory v. Bowlsby,* 126 Iowa, 588; *Newis v. Topfer,* 121 Iowa, 433—in which the doctrine is laid down that an agent is always held under obligation to account to his principal for the property or profits thereof which he has acquired by fraud upon his principal; and it is immaterial that the principal has not suffered any loss in the transaction. It is enough that the agent has derived a profit or advantage by his failure to disclose to the principal facts which it was his duty to disclose in order to enable his principal to deal intelligently.

We find no error in the record, and the cause is *Affirmed.*