[No. 2080]

## FRANCES–MOHAWK MINING AND LEASING COMPANY (A CORPORATION), APPELLANT, *v.* W. L. McKAY, RESPONDENT.

[141 Pac. 456]

1. PRINCIPAL AND AGENT—AGREEMENTS BETWEEN AGENT AND OTHERS—VALIDITY.

An undisclosed agreement between the superintendent of a mining company, who acted as its agent with respect to all workings within the ground of the company, and inspected the works of lessees, etc., and a lessee of the company, whereby the superintendent was to receive a percentage of the profits of the lessee, is in its very nature a fraud upon the mining company because it would tend to place the superintendent in a position antagonistic to his principal.

2. PLEADING—ADMISSIONS IN PLEADING—NECESSITY OF PROOF.

Where defendant's answer admitted a fact, proof of that fact was wholly unnecessary.

3. PRINCIPAL AND AGENT—LIABILITY OF AGENT—RIGHTS OF PRINCIPAL.

 Where an agent enters into a contract with one who has dealings with his principal which gives him an interest antagonistic to his duty towards his principal, the principal may recover from the agent any sum so received.

4. PRINCIPAL AND AGENT—DUTY OF AGENT—RIGHTS OF PRINCIPAL.

 Though, where an agent fully discloses the facts, his principal cannot require him to account for any sum which the agent may receive from a third person as consideration for an agreement with such third person which places him in a position antagonistic to his principal, yet, if the agent fails to disclose all of the facts pertaining to the transaction, the principal may recover any sum received by the agent.

5. PRINCIPAL AND AGENT — RIGHTS OF PRINCIPAL — ACTIONS — EVIDENCE.

 In an action by a mining company to recover from its agent sums received from a lessee under an agreement which caused the agent to assume a position antagonistic to the company, evidence *held* sufficient to show that the mining company was not fully informed as to the agreement.

APPEAL from the Seventh Judicial District Court, Esmeralda County; *Peter J. Somers*, Judge.

Action by the Frances-Mohawk Mining and Leasing Company against W. L. McKay. From a judgment for defendant, plaintiff appeals. **Reversed and remanded.**

*H. V. Morehouse*, for Appellant.

*Detch & Carney*, for Respondent.

By the Court, McCARRAN, J.:

The appellant company was lessee of the Goldfield Mohawk Company, in the Goldfield mining district, and as such mined and operated under its lease a block of ground contiguous to the lease, mined and operated by the Curtis Bros., also lessees of the Goldfield Mohawk Mining Company. From the record it appears that the workings of the Curtis Bros. on their lease had approached the lines of the lease operated by the appellant company, and each of the leaseholders had about forty days more in which to operate under the lease from the appellant company. It appears from the record that the workings of the Curtis Bros. were in close proximity to an ore

body which, by reason of the condition and position of the workings of the appellant company, could not have been taken out by the appellant company during the term of its lease.  On the 21st of November, 1906, the appellant company entered into an agreement with the Curtis Bros., whereby the latter were permitted, through their workings, to mine, work, break, and extract ore from the premises and lease of the appellant company, the ore extracted to be shipped to the smelter or mill in the name of the Frances-Curtis Mohawk Lease, and the returns to be made to the banking house of John S. Cook & Co., at Goldfield.  From the net returns there was to be deducted 22½ per cent due to the Goldfield Mohawk Mining Company; secondly, 20 per cent to the appellant company; and 57½ per cent to the Curtis Bros.

Further the agreement was as follows:  "The officers and agents of the parties of the first part shall at all times have access to and through the workings of the party of the second part for inspecting, surveying, and sampling the premises being worked under and by virtue of this contract by the parties of the second part.  This contract may be terminated by either party by giving the other party twenty-four hours' notice of its intention to terminate the same; and the parties of the second part, shall thereupon, discontinue all work in said Frances-Mohawk ground, but they shall have the right to ship all ore then broken, and the same shall be settled as hereinabove provided."

The question of agency in this case is one vital to the issue and, were it not especially admitted in the answer of respondent, it might be questionable as to whether or not, as superintendent, respondent was also the agent for the appellant company; but, being admitted by the answer, it must be considered as settled so far as this case is concerned.

From the testimony of the respondent, and also from the testimony of the witness Peters, called in behalf of respondent and who it appears was interested in the Curtis Bros. lease, it appears that an agreement was

entered into between the Curtis Bros. and respondent, by the terms of which agreement respondent was to act as consulting engineer for the Curtis Bros. in their mining operations carried on within the lease of the appellant company. As to this transaction the respondent McKay testified:

"A. Well, I think it was in the morning, or early in the afternoon, that I met Mr. Curtis and Mr. Peters, manager, and they said: 'Now, Mac, we are getting out of the hole. You have treated us nice, and we are going to give you an interest in the lease, and we want you to be our consulting engineer.' Of course, that was merely a figurehead, that consulting engineer.

"Q. You acted as consulting engineer then for the Curtis Bros. lease? A. Oh, yes; I used to help them out."

Mr. Peters, testifying on the same subject, said:

"A. Well, as I remember, we were in the Curtis Mohawk lease one morning, and at that time we were not very familiar with the different conditions that we were meeting every day, and the final sum and substance of it was that we were to use Mr. McKay for a 5 per cent interest in a consulting capacity.

"Q. Did you make that proposition to Mr. McKay? A. I did.

"Q. And what was Mr. McKay to do for that 5 per cent? A. Give us the benefit of his knowledge on the ground up above."

On cross-examination the witness McKay testified as follows:

"Q. And as you were superintendent of the Frances-Mohawk you would have supervision of the sublease, too, to see that it was properly conducted to obtain the greatest advantage to the Frances-Mohawk Company? A. Yes, sir.

"Q. And in such position as superintendent you would naturally be called in consultation with the superintendent of the Curtis Bros. sublease? All of that would be in the line of your duty flowing out of your position as

superintendent of the Frances-Mohawk Company?  A. Yes, sir.

"Q. If therefore a drift or a winze, or stoping, or anything of that kind, had to be done on the subleased ground of the Curtis Bros., it would be your duty, as superintendent of the Frances-Mohawk lease, to see that that work was properly done on the subleased ground? A. Yes, sir."

It nowhere appears in the record in this case that the appellant company was apprized of, or had any knowledge of, the exact agreement between its superintendent, respondent herein, and its sublessee, excepting as appears from the testimony of respondent himself, and in testifying as to that he says:

"I told Mackenzie (Mackenzie was general manager of the appellant company) that they had made me this offer.

"Q. What did he say?  A. He didn't say anything."

It nowhere appears that any information was conveyed to the appellant company, or to its representatives by the Curtis Bros., or their representatives, as to the understanding or agreement entered into between the Curtis Bros. and McKay. As a result of the sublease, the Curtis Bros., during the forty days or thereabouts in which that lease was operated, extracted, from the ground covered by the Frances-Mohawk lease, ore to the value of approximately $185,000.  The appellant company received as its share under the agreement appproximately $57,000.

It is admitted by the respondent that, by reason of the agreement entered into between himself and the Curtis Bros. for a 5-per-cent interest, he received $3,187.  The respondent in this case was, according to his testimony and his pleadings, the superintendent and agent for the appellant company and in their employ at a salary of $300 per month.  His duties under his employment required that he should not only superintend the workings of the appellant company during the term of its lease, but should also, in the interest of the appellant company, oversee and superintend the workings of the

sublease conducted by the Curtis Bros., during the term in which that lease would be operated. The appellant company was interested in the workings of the Curtis Bros. as long as their workings were conducted within the ground of the appellant company. The respondent was invested with power and authority to act for them in so far as the cancelation of the lease of the Curtis Bros. was concerned. His principal was interested in every pound of ore extracted by the Curtis Bros. from the ground covered by the Frances-Mohawk lease. Moreover, the appellant company was interested in the manner and method in which mining operations were conducted under this sublease, and to that extent, according to the testimony of respondent, it was his duty to superintend and oversee those workings.

[1] By entering into the agreement with the Curtis Bros., by reason of which agreement respondent was to receive a percentage of the gain from the sublease, respondent was assuming a dual capacity and was assuming the obligation of serving two masters whose interests were to a greater or less extent opposed to each other. He was in the employ of the appellant company at a regular salary, and was their superintendent and agent in all of the workings within the ground of the appellant company. Under his employment and agency it was his privilege and duty to enter the workings of the Curtis Bros. for the purpose of inspecting, surveying, and sampling the premises being worked, and all this he was presumed to do in the interest of his principal, appellant herein.

Any agreement entered into between respondent and the Curtis Bros., which would by its very nature cause him to relax his vigilance and care over the interests of his principal, would as a matter of course be antagonistic to the welfare of his principal, and hence would be a fraud upon the latter, unless the principal was fully apprized of the nature and extent of the agreement.

[2] Again, it must be observed, in passing, that the question of agency in this case is settled by the pleadings,

inasmuch as it is alleged in the complaint of appellant, and admitted in the answer of respondent. If the pleadings in this case denied agency and admitted that the respondent was in the service of appellant merely in the capacity of superintendent, a different question might arise as to the right of the master to control the services of the servant, or to derive gain therefrom; but, as that question is not before us, it is not to be considered in this case.

Counsel for respondent contend that the question involved in this case is one of master and servant, rather than principal and agent; but this contention we assume is answered by respondent's own pleadings, wherein he admits agency. Moreover, it is answered by the testimony of respondent wherein he says:

"To tell you the truth, I came within a very small margin of forfeiting their lease as much as a dozen times. I had the power to forfeit their lease on twenty-four hours' notice.

"Q. But you didn't forfeit it? A. No, sir.

"Q. But the lease went on and was completed, and afterwards you felt such a deep interest in the money that you sued for $187 balance, did you not? A. I always want all that is coming to me."

[3-4] The law will not tolerate an agreement or understanding between one principal and the agent of another, by which agreement such agent is to receive a commission or reward, which gives the agent an interest against his duty to his principal. In other words, an agent cannot be allowed to put himself in a position in which his interest and his duty will be in conflict, and, if he does, any profit that he may derive in the execution of his new assumed position must be accounted for to the principal who may claim it as a debt for money received for his use. Any gratuity to an agent, after he has entered into his agency, given to him for the purpose of influencing the execution of his agency, must be accounted for to his principal. (*Stoner* v. *Weiser*, 24 Iowa, 434; *Moore* v. *Mandlebaum*, 8 Mich. 433; *Yeoman* v. *Lasley*,

40 Ohio St. 190; *City of Findlay* v. *Pertz*, 66 Fed. 427, 13 C. C. A. 559, 29 L. R. A. 188.)

In Wald's Pollock on Contracts (3d ed.), the author in discussing this principle says: "The rule is not arbitrary or technical, but rests on the principle that an agent cannot be allowed to put himself in a position in which his interest and his duty are in conflict, and the court will not consider whether the principal did or did not suffer any injury in fact by reason of the dealing of the agent; if the safety of mankind requires that an agent shall be able to put his principal to the danger of such an inquiry as that." (Wald's Pollock on Contracts, 3d ed. 389.)

The rule heretofore asserted and supported by authorities cited is not applicable in an instance where the principal has full knowledge and acquiesces in the transactions entered into by the agent; but where the agent derives a profit or advantage in dealing with that which constitutes the subject-matter of his agency, and fails to disclose to his principal all of the facts pertaining to his transactions, it is the privilege of the principal to demand an accounting of whatever profit the agent may ultimately realize from such dealings. (Labatt, Master and Servant, vol. 5, p. 6338; *Bracken* v. *Jackson*, 140 N.W. 892; *Leonard* v. *Omstead*, 141 Iowa, 485, 119 N.W. 973.)

[5] It is manifest from the record in this case that the appellant company had little, if any, knowledge of the agreement entered into between its superintendent, respondent herein, and its sublessee, the Curtis Bros. It is manifest also from the record that none of the conditions or terms of the agreement were made known to appellant either by the respondent or by the Curtis Bros.

In our judgment the trial court correctly instructed the jury, as to the law applicable to this case; but it is manifest that the jury in rendering the verdict for the defendant, respondent herein, ignored the instructions of the court. The cause should be remanded for a new trial.

It is so ordered.