WEBB VINCENT, Appellee, v. G. L. TREMAIN, Appellant.

PRINCIPAL AND AGENT: Mutual Rights—Agent's Duty to Account for Profits. An agent who departs from the instructions of his principal, and obtains a better result than could have been obtained by following instructions, *must account to the principal for the profits.* Evidence reviewed, however, and held insufficient to establish the relation of principal and agent.

*Appeal from Humboldt District Court.*—N. J. LEE, Judge.

JANUARY 15, 1918.

PETITION in equity for an accounting. The opinion states the facts. Decree for the plaintiff in the district court. Defendant appeals.—*Reversed.*

*Burnquist & Joyce* and *Robert Healy,* for appellant.

*A. N. Botsford* and *Kenyon, Kelleher & Price,* for appellee.

GAYNOR, J.—For the purposes of this opinion, we may assume that plaintiff was the owner of 150 shares of the

capital stock of the Peoples Savings Bank, at Humboldt,
Iowa, at the time of the happening of the matters herein-
after referred to, and that defendant, G. L. Tremain, was
the president, and a large stockholder in the same bank.

On the 19th day of February, 1913, the defendant, Tre-
main, entered into a written contract with Frank Corey, of
Fort Dodge, and F. A. Ayres, of Lytton, by the terms of
which he sold and assigned to Ayres and Corey not less than
510 nor more than 1,050 shares of the capital stock of the
bank, for the consideration of $220 a share. This contract
was consummated subsequently by Tremain's turning over
to Ayres and Corey all that he had and all that he purchased
of the capital stock of said bank, except 150 shares, which
he retained. At the time the contract was made, Tremain,
the defendant, owned a majority of the stock. Some he
purchased of other stockholders, and thereafter, as fast as
he purchased, transferred the same to Ayres and Corey,
until he finally retained but 150 shares in his own name.
Among the stock transferred by the defendant to Corey
and Ayres were the 150 shares controlled by this plain-
tiff. Plaintiff claims that, in disposing of his 150 shares,
the defendant acted as his agent; that he received from these
purchasers $220 a share, leaving a balance of $20 a share
unaccounted for; that defendant paid to certain agents em-
ployed by him a commission of $5.00 a share for effectuating
the sale, for which he should be credited, leaving a balance
of $15 a share on the 150 shares unaccounted for; and he
asks judgment against the defendant for that amount.

Defendant, however, claims that he was not acting as
the agent of the plaintiff in any sense, in making the sale
of the stock; that he purchased the stock from the plaintiff,
Vincent, at $200 a share, and that there is nothing due the
plaintiff.

Upon these issues, the cause was tried to the court, and

a decree entered for plaintiff, as prayed. Defendant appeals.

We are told at the outset that there is no controversy in the facts. It should be said, there is no controversy in the evidence. The parties radically differ as to what the ultimate fact is, as disclosed by the evidence. It is the claim of the plaintiff that he was the owner of stock in this bank; that, when the defendant undertook to sell all the stock, he included in the sale the stock belonging to this plaintiff; that he acted for the plaintiff as plaintiff's agent in making the sale; that he received $220 a share, but has accounted for but $200 a share; that he concealed from the plaintiff the fact that he was receiving $220 a share, and induced plaintiff to accept $200 a share, in ignorance of the fact that he had actually received $220 a share.

If we assume that defendant did act as agent for the plaintiff in selling this stock, then he should be held to account for the amount received by him, less the cost of effectuating the sale. The plaintiff's case rests entirely upon the fact asserted by him: that, in the sale of this stock, the defendant acted as his agent, received $220 a share, concealed that fact, and induced plaintiff to accept $200 a share in full for his stock so disposed of. Of course, if defendant was, in fact, the agent of plaintiff for the sale of this stock,—acted for the plaintiff,—then, under the rules heretofore recognized by this court, he was bound to account to his principal for all such profits, even though received in excess of the authority given him; and this law is none the less imperative because he has accounted for the full price at which he was authorized to sell. *Merrill v. Sax*, 141 Iowa 386; *Leonard v. Omstead*, 141 Iowa 485; *Bracken v. Jackson*, 159 Iowa 424; *Brown & Co. v. Cash*, 165 Iowa 221.

It appears from this record that this bank was organized in 1881 by the defendant, Tremain, with other asso-

ciates, with a capital stock of $25,000; that, from that time until the sale, in 1913, the defendant was its president and one of its directors, and a large stockholder. In common language, "It was Tremain's bank." He was president and active manager, and carried the responsibilities of the bank. At the time of this sale, he was getting along in years. 'The plaintiff, Vincent, purchased stock in this bank some time after its organization, and owned or controlled 150 shares at the time the sale complained of was made. At that time and for a long time prior, 'the plaintiff had been president and one of the directors of the First National Bank at Fort Dodge. At the time of the sale in question, he was residing in California. It appears that, for some years, Tremain had been talking about selling out, and had talked to the plaintiff, Vincent, about the matter., In one of these conversations, in November, 1912, Mr. Vincent said to the defendant, "You can have my stock at any time for $200 per share." Vincent was perfectly familiar with the condition of the People's State Bank of Humboldt, and had been a member of the examining committee, whose duty it was to report the liabilities and assets of the bank to the state auditor; in fact, knew all about the assets and liabilities of the bank, and was in a position to know the fair value of its stock. Plaintiff and defendant were close friends. About the time of this transfer, voluminous correspondence passed between them. It would not be profitable to set out all this correspondence in full. On the 22d day of January, 1913, the defendant wrote the plaintiff the following letter:

"Man from Muskogee is here. Leaves today. He has not enough money. I offered to loan him up to $20,000 at 6% with People's State Bank stock collateral. He leaves wanting to buy, but don't see clearly how he can. He thinks to get someone to go in with him."

Plaintiff replied, January 28, 1913:

"It takes a lot of money to carry out purchase your friend contemplated. If we could formulate some plan of 'cutting our melon' and distribute our undivided profits, it would not only simplify the problem of selling, but would net us $5,000 additional profits. * * * Shall be glad to hear from you when you are 'out of a job.' "

On February 2, 1913, defendant wrote:

"Yours of the 28th received. I have studied year on propriety of liquidating organizing, perhaps, a Peoples Savings with about 50,000 capital, 25,000 surplus—but now or never. I dread the work. Am getting fat and lazy. My Muskogee man stays in running. Is trying to raise the sum. Could you have someone get your stock and deliver your stocks before you get back, in case of sale. I would repay you or E. H. Rich for you."

To this plaintiff replied, on February 7th:

"I herewith enclose a proxy as desired and an authorization for my boy Donald to sign any stock certificate assignments you may need. I hope you may have use for it before I get home."

To which defendant replied, on February 8th:

"I am thinking the Muskogee man will flat out. Now Mr. Frank Corey, of Fort Dodge, and F. A. Ayres, of Lytton, Iowa, think they want to buy us out. I suppose you know them. In case they want to, would you sell to them on their joint notes? I would have to take their notes for about that sum I think. I suppose they would give you stock for collateral."

To which defendant replied, on February 12th:

"I know Corey well personally. Know Ayres only by reputation. * * * In case of a sale I would take their notes for $15,000 with interest at six per cent payable semi-annually on one year's time; secured by 150 shares of stock in People's Savings Bank. Price of stock $200 per share. How did they hear you thought of selling?"

To which defendant replied, on February 16th:

"If my hand held up as yours does, I would be loath to sell. You can see how I fall down. I consulted the Walters Company of Council Bluffs, might find me a buyer: They found Corey and Ayres and am to go to Fort Dodge 17th to close a bargain if we can."

On February 22d, the defendant wrote the plaintiff:

"Purchase and sale agreed on subject to verifying amount of cash bank accounts etc. on or before March 20th."

On March 21, 1913, defendant wrote Donald Vincent, son of plaintiff:

"Pursuant to an understanding I have with your father advice of which I presume you have from him, and pursuant to talk I had with you at Fort Dodge, you will please deliver to Mr. Corey certificates of 150 shares of stock in this bank held by your father. You may, if you please, consult the enclosed authority from your father."

On March 28, 1913, plaintiff wrote as follows:

"Joint note and stock certificate collateral and check given in your matter and all sent Donald Vincent. Progress of getting nonresident stockholders slow."

Plaintiff replied March 30th:

"Your card received. News interesting. Not new. I had already heard from Donald and that you had closed the deal and paid him my share in compliance with my letter. I congratulate us both. You certainly handled the business in able manner. You did the work and I share in the result. Taking all things into consideration, you made a good sale and I am well satisfied. Corey and Ayres will be likely to do just what you would have done had you not sold, divide the surplus I suppose. I thank you for guarding my interests so well."

It will be noted that, in the sale to Corey and Ayres, no particular stock was mentioned. At that time, defendant was not the owner of all the stock which he agreed to

transfer. It was necessary for him to purchase other stock, in order to consummate the deal. He did purchase stock from other stockholders, to make up the quantum which he agreed to transfer. That he was purchasing stock from other stockholders was made known to plaintiff in the letter dated March 28, 1913, in which he said, "Progress of getting nonresident stockholders slow." It is plain that defendant, at least, believed that, when he got ready to consummate any deal, he could have plaintiff's stock at $200 a share. He had a right to believe this, from what the plaintiff had told him prior to that time, when the matter of sale was under discussion. Nowhere in all the correspondence does plaintiff refer to the fact, or even suggest the fact, that he considers defendant acting in any capacity as agent for him. He makes no inquiry into the terms of the sale. At the time the Muskogee man was seeking to become a purchaser, defendant wrote him:

"Could you have someone get and deliver your stock before you get back in case of a sale? I would pay you or E. H. Rich for you."

To which plaintiff replied:

"I enclose herewith proxy as desired and authorization of my boy Donald to sign any stock certificate assignment you may need. I hope you may have use for it before I get home."

This was before plaintiff had notice that any sale had been consummated. After he had notice of the prospective sale to Corey and Ayers, he wrote, "How did they hear you thought of selling?" and informed defendant that the price of the stock was still $200. It occurs to us that the correspondence on the part of this plaintiff, and what he said in the letters hereinbefore set out, must be understood in the light of what he said to the defendant long prior to that time, when defendant was discussing his desire to sell

out the bank, to wit, "You can have my stock any time at $200 per share."

The relation of agency is contractual. It is the result either of an expressed or an implied contract. Agency must be established before the obligation which the relationship imposes can arise. These two men were experienced business men, both bankers. Both understood the value of the stock in question. There is no evidence in this record of the actual value of the stock. Plaintiff is seeking to recover the difference between what he claims defendant received, and what he claims the defendant paid him. In the contract of sale from defendant to Corey and Ayres, in which the value was fixed at $220 a share, defendant bound himself as follows:

"The party of the first part (meaning the defendant) guarantees the assets and liabilities of said People's State Bank are correctly stated and recorded in the daily statement of this bank as of this date, and that said assets will remain undisturbed until the date of final transfer to the parties of the second part.

"The party of the first part (meaning the defendant), hereby guarantees the payment of bonds issued by the Northern Iowa Power Company of Humboldt, Iowa, now the property of the People's State Bank, amounting to $9,600.

"The party of the first part also agrees to lend his assistance in securing the payment of the obligations of the Northern Roller Milling Company of Humboldt, Iowa, when due to the People's State Bank, and in the event of said company not being able to pay said notes when due, to see that real estate security for the same is given in twice the amount of the indebtedness."

It was further stipulated in said contract that the party of the first part (meaning the defendant herein) "agrees to enter into the banking business in Humboldt

County, Iowa, no more other than as a possible stockholder, director or customer of the People's State Bank."

So it is apparent that, in consideration of the amount agreed to be paid by Corey and Ayres for the stock sold to them by the defendant, the defendant assumed other obligations, and surrendered rights which, no doubt, entered into the consideration of the amount agreed to be paid. It further appears that defendant paid $12,950.16 of the notes of the Milling Company, referred to in the contract; that this company was insolvent; that he was in no way endorser or guarantor of these notes until he signed the contract with Corey and Ayres.

We think this record justifies us in stating the situation this way: Plaintiff, by word and conduct, said to defendant,—or at least gave him to understand, and defendant so understood, at the time the sale was made:

"We are friends. You are getting old. You wish to retire from the banking business. When you do, and wish to sell, you can have my stock at $200 per share." We do not find in this record the proof which requires the application of the rule of agency to this transaction, so far as the defendant is concerned. We find no equity in plaintiff's claim supported by the record in this case. We think the petition should have been dismissed. The cause is, therefore,—*Reversed.*

PRESTON, C. J., EVANS and STEVENS, JJ., concur.